*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0326p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-4588

ROGER D. BLACKWELL,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-00134—James L. Graham, District Judge.

Argued: July 25, 2006

Decided and Filed: August 29, 2006

Before: MOORE, CLAY, and GRIFFIN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** William C. Wilkinson, THOMPSON HINE, Columbus, Ohio, for Appellant. J. Michael Marous, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee. **ON BRIEF:** William C. Wilkinson, Scott A. Campbell, O. Judson Scheaf, III, Michele L. Noble, THOMPSON HINE, Columbus, Ohio, for Appellant. J. Michael Marous, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge. Defendant, Roger D. Blackwell, appeals a December 15, 2005 final judgment of the United States District Court for the Southern District of Ohio, convicting Defendant of one count of conspiracy to commit insider trading in violation of 18 U.S.C. § 371, one count of conspiracy to obstruct an agency proceeding in violation of 18 U.S.C. § 371, fourteen counts of insider trading in violation of 15 U.S.C. §§ 78j and 78ff, one count of obstructing an agency proceeding in violation of 18 U.S.C. § 1505, and two counts of making false statements in a federal matter in violation of 18 U.S.C. § 1001; sentencing Defendant to seventy-two months imprisonment; and fining Defendant $ 1,000,000. For the reasons set forth below, we **AFFIRM** Defendant's convictions and sentence.

# I.

# BACKGROUND

Defendant is a former professor at Ohio State University's School of Business, as well as the president of Roger Blackwell and Associates ("RBA") and an investor in Black Jack Enterprises. Between 1991 and 2004 he was married to Kristina Stephan-Blackwell ("Stephan-Blackwell"). The events in this case arise out of the conduct of Defendant and Stephan-Blackwell in 1999, while Defendant was a member of the board of directors of a small natural foods company, Worthington Foods ("WF"). In July 1999, Kellogg Company ("Kellogg") initiated negotiations for a buyout of WF. The buyout occurred in October 1999. Between July and October 1999, however, several of Defendant's friends and family members invested in WF stock. The following is a list of persons linked to the Blackwells, who bought stock between July and October 1999:

- Gertrude and Alfred Stephan ("the Stephans"), the parents of Stephan-Blackwell;

- Dale and Christian Blackwell, the father and son of Defendant, respectively;

- Kelley L. Hughes ("Hughes"), RBA's director of marketing;

- Kevin L. Stacey ("Stacey"), the husband of Hughes;

- Arnold L. Jack ("Jack"), a long-time friend of Defendant and co-owner of Black Jack Enterprises;

- Justin Voss ("Voss"), a long-time friend and business associate of Defendant; and

- Jack Kahl ("Kahl"), a long-time friend and business associate of Defendant.

The increased buying activity in WF stock between July and October 1999 led to an investigation. On December 15, 1999, the National Association of Securities Dealers ("NASD") sent Kellogg a questionnaire on the Kellogg-WF buyout, requesting information on relationships between persons who bought stock between July and October 1999 and persons who knew about the buyout. Pursuant to the NASD inquiry, Kellogg forwarded the list of persons who bought stock to Defendant, and requested that he inform them of any relationships he had with such persons. Defendant responded to the inquiry by stating: "I supplied no information about the transaction to any of the people on the list or any one else. When asked by anyone about Worthington Foods during this period, I replied that I was not able to comment about the company's stock, as is my standard practice." (J.A. at 4882.)

On March 16, 2000, the NASD sent a follow-up questionnaire to Kellogg. The follow-up, among other things, explicitly requested that Defendant supply information on his relationships to the Blackwells, Jack, Black Jack Enterprises, Hughes, Stacey and a statement as any circumstances under which they might have learned of the buyout. Defendant responded, explaining his relationships to them, but denying that he informed them of the buyout. Defendant stated, and still maintains, that he promoted WF because he believed in its value, but never disclosed the buyout.

On November 2, 2000, the Securities and Exchange Commission ("SEC") issued a subpoena, requiring Defendant to produce various documents and appear to testify before the SEC. Defendant eventually testified before the SEC on January 9, 2001, claiming that he did not disclose any information about the Kellogg-WF buyout to any person. In January 2002, the SEC sent a written inquiry to Defendant. Defendant responded on January 18, 2002, reiterating his position that he never disclosed any information about the Kellogg-WF buyout. In February 2002, Stephan-

Blackwell and her parents testified before SEC. They denied that Blackwell had given them insider information on the buyout.

In early 2003, Defendant and Stephan-Blackwell began to have marital difficulties. They separated and Stephan-Blackwell moved to New York, where she began dating Terry Lundgren. In the spring of 2004, Stephan-Blackwell's attorney contacted the government about the instant case. Sometime thereafter Stephan-Blackwell learned that the government was considering pressing charges against her for perjury and insider trading. In the summer of 2004, Stephan-Blackwell and the government worked out an immunity deal, in which Stephan-Blackwell and her parents would receive immunity in exchange for Stephan-Blackwell's admission to conspiracy, perjury, and insider trading and testimony against Defendant. Stephan-Blackwell and Defendant finalized their divorce at approximately the same time. Several months later, Stephan-Blackwell and Lundgren became engaged.

In this same time period, Kahl also approached the government about his involvement in the instant case. On May 27, 2004, pursuant to a proffer of immunity, Kahl admitted to the FBI that Defendant tipped him on the Kellogg-WF buyout. Subsequently, Kahl testified before the grand jury. Specifically, Kahl testified that he spoke with Defendant around 12:30 p.m. on his (Kahl's) birthday, September 20, 1999, and that Defendant informed him that Kellogg was going to buy out WF and that Kahl should buy WF stock.

On August 26, 2004, a grand jury indicted Defendant, Hughes, Stacey, Jack, Voss, and Black Jack Enterprises on charges of insider trading in violation of 15 U.S.C. §§ 78j and 78ff, conspiracy to commit insider in violation of 18 U.S.C. § 371, obstruction of agency proceedings in violation of 18 U.S.C. § 1505, conspiracy to obstruct agency proceedings in violation of 18 U.S.C. § 371, and making false statements in violation of 18 U.S.C. § 1001.

At trial Stephan-Blackwell, Mary Hiser, Jack Kahl, Dwight Twomley, and Michelle Destefano testified for the government. Stephan-Blackwell testified that she informed her parents, the Stephans, and her cousin, Sigrid McFetridge, of the buyout and encouraged them to buy WF stock after discussing the propriety of doing so with Defendant. She further testified that she and Defendant gave her parents money to buy WF stock. Stephan-Blackwell also testified that both she and Blackwell lied to the NASD and SEC about the tipping, and that she coached her mother to lie to the SEC. She further testified that she deleted emails to Jack Kahl, Sigrid McFetridge, Gertrude Stephan, and Justin Voss on November 8, 2002, after receiving a SEC subpoena, in order to protect herself and Defendant. According to Stephan-Blackwell, Defendant was aware of the deletions and condoned them. Additionally, she and Blackwell formulated a plan to withhold information and obscure their relationships with parties who bought WF stock.

Significantly, during Stephan-Blackwell's trial testimony, Defendant allegedly mouthed "I hate you" to Stephan-Blackwell. Finding that such conduct would constitute witness intimidation, the district court allowed Defendant to be cross-examined on this issue, during which Defendant denied mouthing anything to Stephan-Blackwell.

Mary Hiser, Defendant's assistant at RBA, testified that she was responsible for opening mail and emails at RBA and that no mail or emails had been sent to RBA about the buyout. Hiser further testified that on November 10, 2000 she noticed that four entries had recently been deleted on November 8, 2000 from RBA's database: (1) Sigrid McFetridge; (2) John Kahl;[1] (3) Alfred Stephan; and (4) Justin Voss. Hiser printed a copy of the record of deletion because she knew that RBA's files had been subpoenaed. The record was entered into evidence.

---

[1] There is some debate over to whom John Kahl refers. Jack Kahl's full name is John, but John is also his son's name.

Jack Kahl testified that Defendant Blackwell informed him of the buyout, and that he bought WF stock on the morning of his birthday, September 20, 1999, based on the tip. Kahl could not remember the exact date that Defendant tipped him but believed it was around his birthday.

Twomley, WF's CEO and chairman of the board in 1999, testified regarding WF, the buyout, and Defendant's knowledge of it as a board member. Twomley further testified that there were rumors, mainly among WF employees, in the summer of 1999 that a bigger company would buy out WF.

Michelle DeStefano, an FBI agent involved in investigating the defendants, testified that subpoenaed phone records evidenced numerous phone calls between the defendants between July and October 1999.

Thereafter, defendants Jack, Voss, Hughes, Stacey, and Blackwell, as well as non-defendants, Dale Blackwell (Defendant's father), Professor Jarrell, and John Adams testified for the defense. All the defendants denied wrongdoing. Specifically, they all denied that Defendant Blackwell informed them of the buyout. Jack, an attorney, and Voss, who has a Ph.D. in economics and formerly was a professor at George Washington University, additionally testified that they had extensive stock market experience and bought WF stock because it appeared to be a good deal.

Professor Jarrell, former chief economist for the SEC, testified that WF stock was undervalued in September 1999, and thus that it was a good buy. He further testified that sophisticated investors would recognize that WF was undervalued and a potential target for a buyout. Professor Jarrell also explained "leakage theory." According to Professor Jarrell, information on mergers and buyouts will often "leak" to the public without insider trading. Companies about to buy out or be bought out give off signals indicating that a future buyout will occur. Sophisticated investors, especially analysts, and research companies looking for these signals, often learn of buyouts before they are publically announced. Similarly, family members and close friends may notice an insider's increased activity levels and presume that a merger, or some other large transaction, is about to occur. Finally, Adams testified that he saw rumors of the buyout on Yahoo.

Based on the testimony described above, a jury convicted Defendant of insider trading, conspiracy to commit insider trading, conspiracy to obstruct an agency proceeding, and obstruction of an agency proceeding. A juror's interview in a Columbus magazine, published several months after trial, states that three jurors believed they saw Defendant mouth "I hate you" to Stephan-Blackwell and that Defendant's denial of such actions destroyed his credibility. Defendant moved for a new trial based on the "lip reading incident," which the district court denied.

## II.

## DISCUSSION

Defendant challenges his conviction on the following grounds: (1) the trial court denied him a meaningful opportunity to present a defense by excluding evidence and limiting cross-examination; (2) the government withheld exculpatory, material evidence in violation of *Brady v. Maryland*; (3) insufficient evidence exists to support his convictions for conspiracy, false statements, and obstruction of an agency proceeding; (4) the conspiracy indictment materially varied from the evidence at trial, allowing the introduction of prejudicial evidence and depriving him of the opportunity to prepare an adequate defense; (5) the trial court's jury instructions were improper; (6) three jurors violated Defendant's right to confront witnesses by "testifying" that Defendant mouthed "I hate you" to Stephan-Blackwell during jury deliberations; and (7) cumulative errors rendered Defendant's trial fundamentally unfair in violation of due process.

Defendant challenges his sentence on the following grounds: (1) the $1,000,000 fine was excessive; (2) the condition on Defendant's supervised release, prohibiting him from profiting from writing about his crimes, violates the First Amendment; (3) the district court improperly enhanced his sentence by miscalculating "loss amounts" attributable to Defendant's conduct; and (4) the district court failed to consider all of the relevant § 3553 factors.

We find that all of Defendant's claims on appeal are wholly without merit. Each issue is discussed separately below.

## A.     Meaningful Defense

Defendant argues that he was denied the right to present a meaningful defense in violation of the Fifth and Sixth Amendments of the United States Constitution when the district court excluded testimony from defense witnesses Professor Jarrell, Jehn, Adams, and Cusato, and when the district court limited his cross-examination of prosecution witnesses Stephan-Blackwell and Kahl. For the reasons set forth below, we find that Defendant was not denied the right to present a meaningful defense.

### 1.     Standard of Review

The parties in this case dispute the standard of review. Defendant argues that this Court applies *de novo* review to constitutional challenges to evidentiary decisions whereas the government argues that this Court applies the abuse of discretion standard of review to all evidentiary decisions. While the government is correct that we review all challenges to district court evidentiary rulings, including constitutional challenges, under the abuse of discretion standard, *see United States v. Schraene,* 331 F.3d 548, 564 (6th Cir. 2003); *United States v. Mick*, 263 F.3d 553, 566 (2001); *United States v. Middleton*, 246 F.3d 825, 837 (6th Cir. 2001), the abuse of discretion standard is not at odds with *de novo* interpretation of the Constitution inasmuch as district court does not have the discretion to rest its evidentiary decisions on incorrect interpretations of the Constitution, *see United States v. Johnson*, 440 F.3d 832, 842 (6th Cir. 2006); *see also United States v. Baker*, — F.3d —, 2006 WL 2346312, at *2 (6th Cir. 2006) ("[T]hese two standards of review are not in fact inconsistent because it is an abuse of discretion to make errors of law or clear errors of factual determinations.")

### 2.     The Right to a Meaningful Defense

"Whether rooted directly in the Due Process Clause of the [Fifth Amendment] or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, — U.S. — , 126 S. Ct. 1727, 1732 (May 1, 2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). "While the Constitution thus prohibits the exclusion of defense evidence under rules that are designed to serve no legitimate purpose or that are disproportionate to the ends they are asserted to promote . . . the Constitution permits judges to exclude evidence that is repetitive . . . only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." *Id.* (internal citations and quotations omitted). Accordingly, "'[t]he accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)); *see also United States v. Scheffer*, 523 U.S. 303, 308 (holding that rules of evidence only infringe on a defendant's right to present a defense where they are arbitrary or disproportionate or infringe on a weighty interest of the accused). Moreover, even where a district court erroneously excludes defense evidence, "[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the

omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." *Washington v. Shriver*, 255 F.3d 45, 57 (2d Cir. 2001).

### 3.          Defendant Was Not Denied the Right to Present a Meaningful Defense

### a.          Exclusion of Professor Jarrell's Testimony

The exclusion of portions of Professor Jarrell's testimony was not an abuse of discretion, and accordingly, did not deny Defendant the right to present a meaningful defense. Defendant offered Professor Jarrell's testimony to support an alternative theory of events: that Defendant's friends and family learned about the merger through "leakage" and not insider trading. Importantly, Professor Jarrell was allowed to testify about leakage theory. Professor Jarrell explained that information about a buyout may "leak" not only through an insider's improper disclosure but also through non-insiders' observations of company activity in the period leading up to a buyout. The only portion of Professor Jarrell's testimony that the district court excluded was testimony relating to the existence of trading by persons with relationships to WF directors other than Defendant, and correspondingly, a chart demonstrating such trading ("the Jarrell Chart"). The district court reasoned that the testimony and chart were not relevant and thus were inadmissible.

We believe that the district court's holding was correct. Federal Rule of Evidence 402 permits the introduction only of relevant evidence. Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. As the district court held, the excluded testimony did not make "leakage" any more likely than tipping, and thus did not make Defendant's innocence "more probable . . . than it would be without the evidence." Fed. R. Evid. 401. Professor Jarrell was not proffering testimony that the existence of trading around other WF officials made leakage a more probable explanation than tipping. Instead, Professor Jarrell planned to testify that the trading around other WF officials could have been caused by leakage. It is equally plausible, however, that the other directors tipped their relations. As the district court correctly explained, "Maybe they should have prosecuted these other people, too. Just because they didn't prosecute everybody, [doesn't make the testimony] relevant." (J.A. at 2297.)

We might have reached a different conclusion regarding relevancy if Defendant was prepared to offer proof that the sheer existence of trading around all directors made leakage a more likely theory than insider trading. Neither the record, briefs, nor arguments on appeal, however, indicate that Defendant was prepared to offer evidence that trading around numerous WF officials makes leakage a more plausible theory of information dissemination than insider trading. Although Defendant contends that leakage was more likely than insider trading, Defendant does not contend that the sheer existence of trading around other directors is proof of this. Instead, Defendant argues that the trading around the other directors was leakage, and thus the chart leads to the inference that the trading around Defendant was leakage. (Def.'s Br. 22 ("The jury was not permitted to learn that Leakage is not just an 'ivory tower' theory. It occurred around almost every WF official . . .").) As explained above, Defendant simply offered evidence that the trading around other WF officials was leakage, and consequently, the evidence does not permit an inference that the trading around other officials indicated that his family and friends learned about the merger through leakage.

Furthermore, we reject Defendant's argument, which we duly note was newly crafted on appeal, that Professor Jarrell's testimony was relevant to demonstrate other sources of tipping – the other WF directors – thereby decreasing the likelihood that Defendant tipped his family and friends. While the existence of other sources of tipping surely was relevant to Defendant's case, Professor Jarrell was not qualified to testify about these sources inasmuch as he lacked personal knowledge of them. Experts may rely on knowledge outside their own personal knowledge when testifying on

"scientific, technical, or other specialized knowledge." *United States v. Bond*, 12 F.3d 540, 566 (6th Cir. 1994). They must rely on personal knowledge, however, when testifying on all other subjects. *See* Fed. R. of Evid. 601, 701; *United States v. Scheffey*, 57 F.3d 1419, 1428 (6th Cir. 1995). Testimony on the activities of WF employees does not require specialized knowledge, and consequently, is subject to 701's personal knowledge requirement.

### b.     Exclusion of the Testimony of Jehn, Adams, and Cusato

Similarly, the exclusion of the testimony of Jehn, Adams, and Cusato did not deny Defendant the right to present a meaningful defense. The district court excluded three types of evidence from Jehn, Adams, and Cusato: (1) Jehn's statement that he had heard that Yahoo contained rumors about a Kellogg buyout of WF; (2) Adam's statements recounting his conversation with Jehn about buyout rumors; and (3) statements from all three men that a WF employee tipped them off on the buyout. The first two sets of statements were properly excluded under the rule against hearsay while the exclusion of the third set of statements constituted harmless error. Because neither the Fifth nor Sixth Amendment prohibit the exclusion of hearsay unless such exclusion infringes on a weighty interest of the accused, *see Scheffer,* 523 U.S. at 330 n.17, nor require this Court to reverse a conviction for harmless evidentiary error, the exclusion of the testimony of Jehn, Adams, and Cusato did not deprive Defendant of a meaningful opportunity to present a defense.

First, both Jehn's statement that he heard that a Yahoo message board contained a rumor about the buyout and Adams' statements recounting his conversation with Jehn were properly excluded under the rule against hearsay. Under the rule against hearsay, a witness may not testify as to "statement[s] other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801 and 802. Jehn's testimony about the Yahoo statement was a recounting of a statement made outside of court and was offered to prove the matter asserted in that out of court statement, the existence of a rumor on Yahoo. Thus, Jehn's statement was hearsay. Similarly, Adams' testimony regarding his conversation about rumors with Jehn was a recounting of statements made outside of court offered to prove the matter asserted in the statement, that Adams and Jehn both heard rumors of the buyout. Accordingly, Adams' testimony was hearsay.

Defendant attempts to argue that the Yahoo statement was not hearsay by arguing that it was not offered to prove the truth of the buyout, but simply the existence of rumors. Defendant's argument misses the point; the fact that the statement was offered to prove the existence of a rumor on Yahoo is exactly what makes it hearsay. The out of court statement repeated by Jehn asserted the existence of a rumor on Yahoo, not the existence of a buyout. Thus, the statement is hearsay even if offered to prove the existence of the Yahoo rumor. It would be double hearsay if offered to prove the existence of the buyout. Importantly, Adams, who actually saw the rumor on Yahoo, was permitted to testify that there was a rumor on Yahoo about the buyout.

We further note that this testimony was not offered for the purpose of demonstrating the reason that Jehn bought WF stock, nor would it have been admissible for this purpose. Although the testimony would not have been hearsay if offered to prove Jehn's motivation, Jehn's motivation was not relevant to any issue at trial. Blackwell was not charged with tipping Jehn. Blackwell simply offered Jehn's testimony to support to support his theory that the persons he allegedly tipped could have learned of the buyout from other sources.

Second, the exclusion of the testimony of Jehn, Adams, and Cusato that they were tipped on the buyout from a WF employee was harmless, and thus, did not deprive Defendant of the right to present a defense. *Washington*, 255 F.3d at 57. Dale Twomley testified that rumors of a buyout were circulating among WF employees and Adams testified that a rumor was posted on a Yahoo message board. Thus, the jury was aware that persons other than Defendant possessed information

about the buyout and conceivably tipped Defendant's family and friends.   The exclusion of cumulative testimony does not impair the right to present a meaningful defense. *Holmes*, — U.S. — , 126 S. Ct. at 1732.

### c.      Limitation on the Cross-examination of Kahl

The district court's limitation on Defendant's cross-examination of Kahl did not deprive Defendant of a meaningful opportunity to defend himself.  The defense theory was that Kahl changed the date of the tip after his WF stock order tickets and phone records established that Defendant could not have tipped Kahl on September 20, 1999.  The order tickets showed that Kahl bought WF stock the morning of the 20th before speaking with Defendant.  Defendant raises two specific ways in which the district court limited his ability to question Kahl about the discrepancy between the date Kahl gave before the grand jury – September 20, or his birthday –  and the date Kahl gave at trial – probably in the days before his birthday.  First the district court sustained an objection to a question from defense counsel asking Kahl what date Kahl stated before the grand jury.  Second, the district court sustained an objection to defense counsel's attempt to have Kahl to lay a foundation for Kahl's order tickets for his WF stock, which contained the date and time at which Kahl bought WF stock.

Both of the district court's rulings were correct legal applications of standard, justifiable rules of evidence, and accordingly, did not deprive Defendant of the right to present a meaningful defense. *See Egelhoff*, 518 U.S. at 42.  The district court sustained the first objection because the question was repetitive.  Defendant's attorney had already asked Kahl this question, and received an honest answer, on seven occasions.  The district court sustained the second objection because Kahl had never seen the order tickets.  Normally, Kahl's stock broker took care of the details of his stock transactions.  Kahl therefore had no personal knowledge of the ticket and was not the proper witness to question about it. Fed. R. Evid. 602.  Significantly, Defendant later called a  stock broker to testify about the order tickets and was able to introduce the order tickets at that time.

Furthermore, Defendant exaggerates the discrepancy between Kahl's grand jury testimony and trial testimony.  In reality, any discrepancy was minor and did not truly discredit Kahl's testimony.  Defendant cites the following language to emphasize how "sure" Kahl was of the September 20 date in his grand jury testimony:

> Q:      So is there any doubt in your mind that you were talking to Roger Blackwell
> on the telephone on your birthday in 1999.
>
> A.      There is no doubt.

(J.A. at 4279.)  However, read in context it is clear that the "no doubt" refers to the fact that the person on the other end of the phone was Defendant and not the date of the conversation. The above quoted question and answer in context read as follows:

> Q:      In addition to that over the years of your friendship with Roger Blackwell,
> have you spoken with him in person and on the telephone on many
> occasions.
>
> A:      Oh, yeah.
>
> Q:      As a consequence of those discussions with Roger Blackwell, did you learn
> to recognize his voice?
>
> A:      Yes.

Q:    So is there any doubt in your mind that you were talking to Roger Blackwell on the telephone on your birthday in 1999.

A.    There is no doubt.

(J.A. at 4277-78.)  Additionally, other comments by Kahl before the grand jury evidence he did not recall details.  (*See* J.A. at 4279-80 ("You, know, this is – I'm trying to re-put this thing together. Because the hard facts I remember well.  The rest of it is all fuzz.  But I believe he was calling to wish me a happy birthday and started kidding around that I ought to eat more veggie burgers.").) Inasmuch as the district court's limitations on Defendant's cross-examination of Kahl were both proper and harmless, they did not violate Defendant's right to present a meaningful defense.

### d.      Limitations on the Cross-examination of Stephan-Blackwell

Finally, the district court's limitations on Defendant's cross-examination of Stephan-Blackwell did not deprive Defendant of a meaningful opportunity to defend himself because the limitations were harmless.  Defendant argues that the district court erred in limiting Defendant's questions to Stephan-Blackwell on (1) the timing of her immunity agreement; (2) her own understanding of her immunity agreement; (3) and her relationship with Terry Lundgren. According to the Defendant, these questions were necessary to prove bias and attack Stephan-Blackwell's credibility.  In particular, Defendant aimed to challenge Stephan-Blackwell's claim that she lied to the SEC to protect Blackwell because she loved him.

Information on all three of these issues came out during Stephan-Blackwell's cross-examination, rendering her bias more than apparent.  On cross-examination, Stephan-Blackwell admitted that she was dating Lundgren in 2003, at which time she was still lying to the SEC about her involvement in this case.  She further admitted that she approached the government about immunity only after she separated from Defendant and that shortly after she received immunity she became engaged to Lundgren.  Moreover, Defendant raised all these issues in his closing.  Because the limitations placed on Defendant's cross-examination of Stephan-Blackwell did not deprive Defendant of the ability to attack Stephan-Blackwell's credibility and reveal any potential bias, the limitations cannot be said to have deprived Defendant of the opportunity to defend himself. *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000) (holding that Defendant's right to cross-examine a witness for bias or motivation to lie is not grounds for reversal where "the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory of bias or improper motive.").

### e.      Cumulative Effect of the District Court's Evidentiary Rulings

In addition to arguing that each of the district court's evidentiary rulings amounted to independent violations of his right to present a defense, Defendant also argues that the cumulative effect of the district court's evidentiary errors violated his right to present a meaningful defense. We disagree.  Despite Defendant's numerous challenges to the district court's evidentiary rulings, only two of those rulings can possibly be considered erroneous: the district court's limitations on the cross-examination of Stephan-Blackwell and the district court's exclusion of testimony that a WF employee tipped Jehn, Adams, and Cusato.   Taken together, these rulings were not so prejudicial that they denied Defendant of a meaningful opportunity to present a defense.

In asking whether Defendant was ultimately denied a meaningful defense, we look to whether the improperly excluded evidence (or limited cross-examination) would have created a reasonable doubt as to Defendant's guilt.  *Washington*, 255 F.3d at 57.  In the instant case, permitting Defendant to present testimony that a WF employee tipped Jehns, Adams, and Cusato about the buyout  and to cross-examine Stephan Blackwell about the precise date she signed the immunity agreement would not have created a reasonable doubt as to Defendant's guilt.  First, the

testimony that a WF employee tipped Jehns, Adams, and Cusato was not particularly probative. The existence of this tipper did not truly cast doubt on Defendant's guilt inasmuch as Defendant offered no evidence connecting the WF tipper to the persons Defendant allegedly tipped. Second, while Defendant was unable to establish the precise date on which Stephan-Blackwell signed the immunity agreement, Defendant was able to establish the relevant time frame in which Stephan-Blackwell signed the immunity agreement: after leaving Defendant and beginning a relationship with another man. Third, there was extensive evidence of Defendant's guilt, including testimony from Defendant's good friend, Kahl, that Defendant tipped him, testimony from Defendant's ex-wife that Defendant tipped her, and the sheer number of family and friends of Defendant who bought WF stock in the relevant time period. Therefore, we find that even viewing the alleged evidentiary errors cumulatively, Defendant was not denied the opportunity to present a meaningful defense.

## B.     *Brady* **Claim**

The government belatedly provided three documents to Defendant that form the basis for Defendant's *Brady* Claim: (1) a letter to the Stephans' attorney, James E. Phillips, setting forth the government's understanding of the Stephans' immunity agreement ("the Stephans' immunity letter"); (2) the FBI's notes from an interview with Sigrid McFetridge ("the McFetridge Report"); and (3) the FBI's notes from an interview with Benoit, the vice-president of Kellogg ("the Benoit Report"). According to Defendant, the government's belated production of the Stephans' immunity letter and the McFetridge Report rendered him unable to effectively cross-examine Stephan-Blackwell by depriving him of knowledge of the interlocking nature of the Stephans' immunity agreement with Stephan-Blackwell's testimony and the nature of Stephan-Blackwell's role in McFetridge's trading. Specifically, the Stephans' immunity letter made it clear that their immunity was dependant on Stephan-Blackwell's cooperation, which, according to Defendant, gave Stephan-Blackwell an additional incentive to lie. The McFetridge Report states that Stephan-Blackwell tipped McFetridge, encouraged her to buy WF stock, and coached her to lie to law enforcement. Defendant argues that the belated production of the Benoit report deprived him of the exculpatory statements by Benoit regarding the interest of several large companies in WF prior to the Kellogg buyout. Defendant also makes the perfunctory argument that the documents would have altered his voir dire strategy and opening statement, and caused him to subpoena the Stephans before the Stephans left the country. We are not convinced by any of Defendant's arguments.

### 1.     **Standard of Review**

We review a district court's decision to deny a mistrial for delayed disclosure of evidence for abuse of discretion. *United States v. Davis*, 306 F.3d 398, 420 (6th Cir. 2002).

### 2.     *Brady v. Maryland*

"*Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or innocence.'" *United States v. Bagley*, 473 U.S. 667, 675 (1985) (quoting *Brady v. Maryland*, 473 U.S. 83, 87(1963)). Evidence is favorable to the accused if it exculpates the accused or enables the accused to impeach witnesses. *Id.* at 676. Evidence is material to guilt or innocence "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682.

### 3.     **No *Brady* Violation Occurred**

No *Brady* violation occurred in this case. The Defendant received all three documents during trial. *United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006) ("*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose" and [] a "[d]elay only violates *Brady* when the delay itself causes prejudice") (quotation marks and citation

omitted). Furthermore, the district court expressly granted Defendant the opportunity to re-cross examine Stephan-Blackwell and took no action to prevent Defendant from calling Benoit as a witness. Accordingly, Defendant had the opportunity to examine both Stephan-Blackwell and Benoit in light of the disclosed documents and any prejudice resulting from Defendant's failure to do so is not attributable to the government's violation of the principles set forth in *Brady*. *See United States v. Delgado*, 350 F.3d 250 (6th Cir. 2003) (citing *United States v. Corrado*, 227 F.3d 528, 538 (6th Cir. 2000)).

Defendant's argument that the belated disclosure of the documents prejudiced the entire defense, including voir dire and the opening statement is meritless. First, Defendant presents his argument on this issue in a perfunctory manner, providing no explanation of how the disclosed material would have altered his defense. Second, the pertinent information in the disclosed documents was, for the most part, already available to Defendant. *See Bagley*, 473 U.S. at 676 (holding that there is no *Brady* violation unless a reasonable probability exists that the disclosed evidence would have altered the result of trial). Defendant was already aware that the Stephans' immunity interlocked with the testimony of Stephan-Blackwell prior to trial. In fact, Defendant mentioned the interlocking nature of the immunity agreement in his opening statement and cross-examined Stephan-Blackwell on this issue. Thus, if Defendant had wanted to subpoena the Stephans because of the interlocking nature of the immunity agreements, he would have done so. Second, the record indicates that Defendant maintained that Stephan-Blackwell was responsible for tipping her cousin, Sigrid McFetridge, prior to the disclosure of the McFetridge report. Accordingly, we fail to see how McFetridge's admission of the tipping would have altered Defendant's trial strategy. Importantly, Stephan-Blackwell admitted that she tipped McFetridge at trial. The McFetridge Report was therefore cumulative. Third, it was also Defendant's trial strategy from the beginning to prove that WF was an obvious potential target for a buyout by a larger company. Professor Jarrell testified as much. There is thus no possibility that the earlier disclosure of the Benoit Report would have altered Defendant's trial strategy. Consequently, we hold that Defendant's *Brady* claim is meritless.

## C.     Sufficiency of the Evidence

### 1.     Preservation

Although Defendant's statement of the issues raises insufficiency generally, Defendant only makes actual insufficiency arguments in his brief on appeal as to the conspiracy convictions, the obstruction of an agency proceeding conviction, and the false statement convictions. Therefore, all other sufficiency challenges are waived, *see Layne*, 192 F.3d at 566, and we address only the conspiracy, obstruction of an agency proceeding, and false statement convictions. We find that there was sufficient evidence to convict Defendant on all counts.

### 2.     Standard of Review

This Court reviews a "challenge to the sufficiency of the evidence by considering the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999). "'Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.'" *Id.* (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)). "Furthermore, it is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court." *Id.*

### 3.          Sufficient Evidence Exists to Convict Defendant of Conspiracy

Defendant contends that there is insufficient evidence of both conspiracy to insider trade and conspiracy to obstruct justice. His primary argument is seemingly that the act of "tipping" does not evidence a conspiracy to insider trade inasmuch as a conspiracy requires proof of an agreement to act jointly for a common purpose and the act of tipping does not evidence an agreement. Unfortunately for Defendant, there is sufficient evidence of at least two such agreements to trade on insider information: one with the Stephan family and one with Kelley Hughes and Kevin Stacey. Similarly, there is sufficient evidence of an agreement between Defendant, Stephan-Blackwell, and the Stephans to obstruct an agency proceeding.

### a.          The Law of Conspiracy

Section 371 of Title 18 of the United States Code makes it illegal for "two or more persons [to] conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose." To prove conspiracy, the government must establish: (1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy. *See, e.g., United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005); *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). "A tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement [, and] conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (internal citations omitted).

### b.          Conspiracy to Commit Insider Trading

First, there is sufficient evidence of an agreement to trade on insider information between Defendant, Stephan-Blackwell, and the Stephans. Defendant, knowing that tipping was illegal, encouraged Stephan-Blackwell to share the tip with the Stephans. Defendant then gave the Stephans money to buy WF stock, which the Stephans subsequently used to purchase WF stock. Based on this evidence, a reasonable juror, viewing the evidence in the light most favorable to the prosecution, could conclude beyond a reasonable doubt that Defendant, Stephan-Blackwell, and the Stephans agreed to work together to help the Stephans trade on insider information.

Second, there is sufficient evidence that Defendant agreed with Hughes and Stacey to trade on inside information. Hughes, a friend and employee of Defendant, bought huge amounts of WF stock in the three month period after Defendant learned of the buyout and before the buyout occurred. She made these purchases, in part, with a $30,000 loan from the Defendant. These facts permit the inference that Hughes, Stacey, and Defendant agreed to work together to help Hughes violate the law, and a reasonable juror, viewing the evidence in the light most favorable to the prosecution, could conclude the existence of such an agreement was proven beyond a reasonable doubt.

### c.          Conspiracy to Obstruct An Agency Proceeding

Third, there is also sufficient evidence that Defendant agreed with Stephan-Blackwell and the Stephans to obstruct an agency proceeding. Stephan-Blackwell testified that she and Defendant agreed not to volunteer information on and to "obscure" relationships with persons who bought WF stock. Thereafter, Stephan-Blackwell coached the Stephans to lie and deleted contacts from RBA's database with Defendant's knowledge. Knowing that Stephan-Blackwell had deleted the information, Defendant nonetheless failed to correct the deletions before giving the documents to the SEC. Based on this information a reasonable juror could find beyond a reasonable doubt that Defendant, Stephan-Blackwell, and the Stephans agreed to work together to obstruct agency proceedings. Accordingly, Defendant's conspiracy convictions should stand.

**4.       Sufficient Evidence Exists to Convict Defendant of Making False Statements**

The government presented sufficient evidence to allow a reasonable juror to convict Defendant on both counts of making false statements. Section 1001 of Title 18 prohibits any person from (1) "knowingly and wilfully"; (2) "mak[ing] any materially false, fictitious, or fraudulent statement or representation"; (3) "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." Defendant admits that he both testified before the SEC, and had his lawyer send a letter to the SEC stating that he never disclosed any information about the Kellogg-WF buyout. Stephan-Blackwell and Kahl testified that Defendant informed them of the buyout. Accordingly, a reasonable juror could find that Defendant lied, with the requisite intent, to the SEC on two occasions: once when testifying, and once when his attorney wrote to the SEC.

**5.       Sufficient Evidence Exists to Convict Defendant of Obstructing an Agency Proceeding**

Similarly, the government presented sufficient evidence to allow a reasonable juror to conclude that Defendant's involvement in his wife's deletions of RBA's contact list directly after receiving an SEC subpoena constituted obstruction of an agency proceeding. Section 1505 of Title 18 renders obstruction of an agency proceedings illegal. It states:

> Whoever, with intent to avoid, evade, prevent, or obstruct compliance, in whole or in part, with any civil investigative demand duly and properly made under the Antitrust Civil Process Act, willfully withholds, misrepresents, removes from any place, conceals, covers up, destroys, mutilates, alters, or by other means falsifies any documentary material, answers to written interrogatories, or oral testimony, which is the subject of such demand; or attempts to do so or solicits another to do so . . . shall be fined under this title, imprisoned not more than 5 years . . . or both.

Thus, to be convicted of obstruction of agency proceedings, a defendant must have 1) intended to interfere with the proceedings and 2) withheld, misrepresented, removed from any place, concealed, covered up, destroyed, mutilated, altered or falsified any documentary material, answers to written interrogatories, or oral testimony. *See id.* Inasmuch as a reasonable jury could find that Defendant, acting with the requisite intent, misrepresented RBA's contact list to the SEC, it could find that Defendant obstructed an agency proceeding. First, Stephan-Blackwell testified that she and Defendant agreed to obscure their relationships to WF stock buyers, thereby providing a reasonable juror with evidence of Defendant's intent to interfere. Second, Stephan-Blackwell testified that Defendant was present when she deleted the RBA records and that Defendant did not object. As the government correctly points out, Defendant, knowing of the deletions, essentially misrepresented the contact list to the SEC by failing to correct them. *See United States v. Laurins*, 857 F.2d 529, 536 (9th Cir. 1988) (holding that the submission of false documents to IRS violated § 1505). Thus, there was sufficient evidence to allow a jury to find that Defendant's involvement in the deletions amounted to obstruction of an agency proceeding.

**D.       Variance**

**1.       Standard of Review**

This Court reviews *de novo* whether the indictment varied from the proof presented at trial. *United States v. Solorio*, 337 F.3d 580, 589 (6th Cir. 2003). A variance does not constitute reversible error unless it affects a substantial right of the defendant. *Id.* at 590. In this case, Defendant's substantial rights were not affected.

## 2.      Defendant's Substantial Rights Were Not Affected

A variance occurs when an indictment alleges one large conspiracy but the evidence at trial establishes multiple conspiracies. *Kotteakos v. United States*, 328 U.S. 750, 756 (1946). A variance constitutes reversible error if it affects a substantial right of the defendant. *Id.* at 757, 766. A defendant's substantial rights are affected if the defendant is convicted on evidence "unrelated to his own alleged activity." *United States v. Geibel*, 369 F.3d 682, 693 (2d Cir. 2004). Accordingly, the inquiry into whether a variance constitutes reversible error focuses on whether a danger exists that the defendant was convicted based on evidence of a conspiracy in which the defendant did not participate ("guilt transference"). *United States v. Mack*, 837 F.2d 254, 258 (6th Cir. 1988). Typically, the danger of guilt transference "can be cured with a cautionary instruction to the jury that if it finds multiple conspiracies, evidence relating to one conspiracy cannot be considered in examining another conspiracy." *Id.* However, the more evidence presented at trial that is unrelated to the defendant's conduct, or a conspiracy in which the defendant took part, the less likely instructions are to cure the danger of guilt transference. With this in mind, courts have considered the number of conspiracies the evidence establishes, the number of non-conspiratorial co-defendants tried with defendant, and the size of the conspiracy alleged in the indictment in determining whether a variance was prejudicial. *Kotteakos*, 328 U.S. at 766 (contrasting the two conspiracies established in *Berger v. United States*, 295 U.S. 78 (1935), with the 8 conspiracies established in that case); *Geibel*, 369 F.3d at 693.

We need not decide whether a variance occurred in the instant case, because assuming a variance did occur, it did not affect Defendant's substantial rights. As discussed above, a variance only affects a defendant's substantial rights if it creates a danger of improper guilt transference from one defendant to another. In this case, there was no danger of improper guilt transference to Blackwell from any other defendant, *i.e.*, Voss, Jack, Hughes, and Stacey. The trial court instructed the jury that it could not consider evidence of one defendant's actions, including Voss, Jack, Hughes, and Stacey, against another defendant, including Blackwell, unless the jury first found the defendants to be co-conspirators, stating:

> However, statements of any conspirator which are made before its existence or after its termination, or which were not made in furtherance of the conspiracy, may be considered as evidence only against the person marking [sic] the statement. Likewise, if acts were done or statements were made by someone whom you do not find to be a member of the conspiracy, they may be considered by you as evidence only against the person who did the acts or made the statement.

(J.A. at 3839-40.) We presume the jury followed these instructions. *See, e.g., Roberts v. Carter*, 337 F.3d 609, 615 (6th Cir. 2003). Accordingly, we must conclude that the jury did not improperly "transfer guilt" to Blackwell from the other defendants without first finding that the defendant in question conspired with Blackwell.

Relatedly, Defendant argues that the prosecution intentionally varied the indictment from the proof at trial in order to render otherwise inadmissible evidence admissible. Specifically, Defendant argues that the testimony of Stephan-Blackwell and Kahl, regarding Defendant's tipping of the Stephans and Kahl respectively,[2] was propensity evidence used to support other substantive insider trading charges. According to Defendant, the indictment alleged a single conspiracy listing Stephan-Blackwell and Kahl as co-conspirators for the sole purpose of rendering this propensity evidence admissible.

---

[2]Defendant was not charged with tipping the Stephans or Kahl.

We find Defendant's argument to be without merit. In the first place, Stephan-Blackwell's testimony establishes the existence of a conspiracy and would have been admissible to prove the smaller conspiracy had there been no variance. Next, the testimony of both Stephan-Blackwell and Kahl regarding Defendant's tipping practices was relevant to the false statement and obstruction of an agency proceeding charges. Their testimony proved that, contrary to Defendant's SEC and trial testimony, Defendant tipped individuals on Kellogg's planned buyout of WF.

**E.     Jury Instructions**

Defendant argues that the district court's jury instructions constitute reversible error. Specifically, Defendant offers the following arguments as grounds for reversal: (1) the instructions on multiple conspiracies misled the jury by allowing it to convict Defendant of conspiracy if the jury found agreement between Defendant and any alleged co-conspirator; (2) the instructions on conspiracy omitted the phrases "That is the key" and "unindicted co-conspirators"; (3) the instructions included language not found in the Sixth Circuit pattern jury instructions; (4) certain limiting instructions on SEC testimony were confusing; and (5) the district court failed to give the so-called "two inference" jury instruction. For the reasons set forth below, we reject Defendant's arguments.

**1.        Preservation**

Defendant failed to preserve several of the alleged errors in the jury instructions for this Court's review. Specifically, Defendant's brief on appeal fails to offer any argument in support of his contentions that the omission of the phrases "That is the key" and "unindicted co-conspirators," and the use of language not set forth in pattern jury instructions rendered the jury instructions improper. Similarly, Defendant fails to explain in what way the limiting instructions on SEC testimony were confusing. Accordingly, we decline to review these issues. *Layne,* 192 F.3d at 566.

Defendant's remaining arguments – that the instruction on multiple conspiracies were improper and that the district should have given the "two inference" jury instruction – are, however, preserved for our review. Defendant objected to jury instructions on these grounds in the trial court, *United States v. Carmichael*, 232 F.3d 510, 523 (6th Cir. 2000), and developed them in his brief on appeal, *Layne*, 192 F.3d at 566.

**2.        Standard of Review**

This Court "review[s] jury instructions as a whole to determine if they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision and will reverse a jury verdict on account of instructional error only in situations where the instruction, viewed as a whole is confusing, misleading, and prejudicial." *Romanski v. Detroit Entm't, LLC,* 428 F.3d 629, 641 (6th Cir. 2005) (internal quotation marks and citation omitted).

**3.        Multiple Conspiracy Instructions**

The district court's charge on multiple conspiracies was a correct statement of law and was not confusing, misleading, or prejudicial. The district court clearly stated that the jury must find that Defendant participated in the conspiracy alleged in the indictment to convict Defendant of conspiracy; however, the district court also made clear that the jury need not find that Defendant conspired with all co-conspirators alleged in the indictment to determine that Defendant participated in that conspiracy. The trial court's instructions read in pertinent part as follows:

> Now, the government is not required to prove that all of the people named in the
> indictment were members of the scheme or the conspiracy, so long as you find that

at least two persons, one of them being the defendant, were participants in the conspiracy alleged in the indictment.

To convict any one of the defendants of a conspiracy charge, the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment. The government must prove beyond a reasonable doubt that the defendant knowingly and intentionally became a member of the single conspiracy alleged in the indictment as opposed to some other conspiracy. Proof that the defendant was only a member of some other conspiracy is not enough to convict. However, proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict if the government also proved that the defendant was also a member of the conspiracy charged in the indictment.

(J.A. at 3839, 3849.)

The first portion of this instruction is a correct statement of law. A jury need not find that a defendant conspired with all the alleged co-conspirators in order to convict a defendant of conspiracy. *See United States v. Sandy*, 605 F.2d 210, 217 (6th Cir. 1979) (holding the acquittal of several jointly tried co-defendants in a conspiracy case was not grounds for reversing the conviction of a co-defendant and alleged co-conspirator); *see also United States v. Thomas*, 348 F.3d 78, 84 n.3 (10th Cir. 2003) (discussing similar cases).

Similarly, the second part of this instruction is not erroneous and, in fact, mirrors in substance, the Sixth Circuit Pattern Jury Instructions:

(3) To convict any one of the defendants of the conspiracy charge the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment. If the government fails to prove this, then you must find the defendant not guilty of the conspiracy charge, even if you find that he was a member of some other conspiracy. Proof that the defendant was only a member of some other conspiracy is not enough to convict. (4) But proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict if the government also proved that the defendant was a member of the conspiracy charged in the indictment.

Sixth Circuit Pattern Jury Instructions § 3.08(3)-(4) (2005). As a comparison of the two instructions evidences, only one sentence of the second portion of the trial court's instruction differs from the pattern jury instructions. Thus, without more, we cannot say that the trial court's instruction was either misleading or erroneous.

### 4.        Two Inference Instructions

Similarly, the district court's decision not to give Defendant's "two inference" instruction does not constitute reversible error. The district court's actual instruction contained language substantially similar to the proposed instruction. Defendant proposed the following instruction to follow the district court's explanation of the difference between direct and circumstantial evidence:

Circumstantial evidence alone is insufficient to convict a defendant if the circumstantial evidence would support either of two reasonable probabilities – that a defendant is innocent or that the same defendant is guilty of a particular crime charged. Stated differently, if, based on circumstantial evidence alone, you could find a defendant either innocent or guilty, then you must find that defendant innocent. Circumstantial evidence that requires the jury to make a leap of faith or

engage in speculation or conjecture in order to sustain a conviction is not valid circumstantial evidence, and it may not be used to find a defendant guilty.

(J.A. at 367.)  In defining the reasonable doubt burden of proof, the district court instructed the jury:

> Of course a defendant is never to be convicted on mere suspicion or mere conjecture . . . . So if the jury views the evidence in the case as reasonably permitting either of two conclusions, one of innocence, and the other of guilt, then of course the jury should adopt the conclusion of innocence.

(J.A. at 3774.)  Both instructions informed the jury that where two reasonable conclusions exist – innocence or guilt – the jury may not convict the defendant.  Thus, Defendant's proposed instruction would not have added any value to the jury charge.

Moreover, the instruction proposed by Defendant was itself erroneous.  First, the proposed instruction's undue focus on circumstantial evidence improperly implies that the circumstantial evidence is weaker than direct evidence.  *See United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000) (holding that direct and circumstantial evidence are to be given the same weight when reviewing the sufficiency of the evidence).  Additionally, the proposed instruction improperly states that "if, based on circumstantial evidence alone, you could find a defendant either innocent or guilty, then you must find that defendant innocent." (J.A. at 367.)  By omitting any reference to reasonable probability, this statement improperly raises the burden from beyond a *reasonable* doubt to beyond *all possible* doubt.  Consequently, this Court has held similar instructions erroneous.  In *United States v. Scott*,[3] 578 F.2d 1186, 1191-92 (6th Cir. 1978) (quoting *United States v. Holland*, 348 U.S. 121, 139-40 (1954)), the Court rejected an instruction reading "where the Government's evidence is wholly circumstantial it must be such as to exclude every reasonable hypothesis [as opposed to probability] other than that of guilt."  Inasmuch as a district court does not err in refusing to give an incorrect jury instruction, we hold that the district court's failure to give Defendant's proposed "two inference" jury instruction was not improper.

## F.    Jury Interrogatories

Defendant argues that the alleged errors discussed in the previous two sections, namely the variance and jury instructions, were compounded by the district court's refusal to use jury interrogatories or a "special verdict form," requiring the jury to find each element of conspiracy separately before convicting Defendant of conspiracy.  We disagree.

### 1.    Standard of Review

This court reviews a district court's decision to use jury interrogatories for an abuse of discretion.  *Safeco Ins. Co. v. City of White House, TN*, 191 F.3d 675, 681 (6th Cir. 1999).  In this case, the district court did not abuse its discretion in declining to use jury interrogatories.

### 2.    The District Court Did Not Abuse Its Discretion

"In general, special verdicts are not favored [in criminal cases] and 'may in fact be more productive of confusion than of clarity.'"  *United States v. Wilson*, 629 F.2d 439, 444 (6th Cir. 1980) (quoting 8A *Moore's Federal Practice and Procedure* § 31.02(3)).  The general rule against special verdicts in criminal cases has long been considered to prevent the courts from:

---

[3] Although two lines of case law exist on this issue, the earlier and ultimately prevailing view is contained in *Scott*.  578 F.2d at 1192 (tracing the conflict in the case law).

> invad[ing] the province of the jury and infring[ing] on its power to deliberate free from legal fetters; on its power to arrive at a general verdict without having to support it by reason or by report of its deliberations; and on its power to follow instructions of the court.

*Id.* at 443 (citation omitted). In other words, the rule against special verdicts seemingly stems from the common law right of the jury to nullify without being reversed by the king's judges. *See id.* (discussing numerous cases and articles); *see also United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998) ("This rule is fashioned to protect the rights of the criminal defendants by preventing the court from pressuring the jury to convict."). Thus, this rule seemingly exists to protect the rights of the defendant.

While we question the applicability of a rationale against special verdicts to protect defendants in cases where the defendant requests the special verdict, we also recognize that there is no real reason, and no case law support, for abandoning the general rule in this case. First, Defendant has cited no authority for the proposition that a judge's failure to use jury interrogatories or a special verdict constitutes reversible error. Specifically, Defendant relies on two types of cases: one in which courts of appeals *uphold* the district court's decision to use a special verdict, *see Reed*, 147 F.3d at 1181-82; *United States v. Stonefish*, 402 F.3d 691, 699 (6th Cir. 2003); *United States v. Walker*, 97 F.3d 253, 255-56 (8th Cir. 1996), and one in which courts of appeals require lower courts to submit facts to the jury that will be used to increase a defendant's sentence beyond the statutory maximum for the more general crime set forth in the indictment, *see, e.g., United States v. Randolph*, 230 F.3d 243, 252 (6th Cir. 2000) (discussing *United States v. Dale*, 178 F.3d 429 (6th Cir. 1999)). This Court's refusal to reverse a judgment for the use of a special verdict cannot be equated with a requirement that lower courts use special verdicts. In fact, the specific holding of *Stonefish* was that the use of a special verdict did not constitute plain error. Such a holding should not be interpreted as an endorsement of special verdicts. The sentencing line of cases is equally inapplicable. They address the implications of a defendant's right to have a jury decide all facts that increase his or her sentence beyond the statutory maximum. *See Dale*, 178 F.3d at 422-33 (collecting cases). Interrogatories regarding the existence of such facts must be submitted to the jury. *Id.* Defendant, however, did not request the finding of specific facts, separate from the elements of his crime, that would increase his statutory minimum. Even if he had, however, *Randolph* makes it clear that the failure to use a special verdict form does not constitute reversible error. 230 F.3d at 252. Instead, the failure to use the special verdict form simply limits the sentence the trial court may impose. *Id.*

Second, Defendant's concerns regarding the necessity of a special verdict are adequately addressed through an assessment of the sufficiency of the evidence and variance. Defendant is purportedly concerned with the multiple conspiracy issue: whether the jury found that he was involved in the conspiracies alleged in the indictment or some other conspiracy. Although the evidence presented at trial admits the possibility of multiple insider trading conspiracies as opposed to one large insider trading conspiracy, the evidence presented against Defendant would place him squarely within the insider trading conspiracy alleged in the indictment. In other words, there is a possibility that the jury determined that Defendant conspired with only some of the alleged co-conspirators, namely Stephan-Blackwell and her parents, and that Hughes and Stacey formed their own separate conspiracy. Even if this were true, however, Defendant would nonetheless be guilty of the conspiracy alleged in the indictment. Accordingly, we will not vacate Defendant's conviction simply because the district court declined to use jury interrogatories or a special verdict to determine with which persons Defendant conspired.

### G.      The Juror Lip-Reading Incident

Defendant claims that his conviction should be reversed due to alleged juror misconduct during the jury's deliberations. Shortly after Defendant's trial, the *Columbus Monthly* published an interview with a juror in Defendant's case, Joanne Toftner. According to the story in the *Columbus Monthly*, Toftner stated that three jurors witnessed Defendant mouth "I hate you" to Stephan-Blackwell while Stephan-Blackwell was testifying for the prosecution. The three jurors purportedly informed the other jurors of their recollections of the incident during deliberations. Toftner is further quoted as stating that, in light of the fact that three jurors witnessed Defendant mouth "I hate you," Defendant's denial of the incident on cross-examination "virtually sealed [his fate] from my perspective." (J.A. at 972.) Believing that the *Columbus Monthly* article constituted "new evidence," Defendant moved for a new trial on the ground that the juror's conduct violated his Sixth Amendment right to confront witnesses against him. The district court denied the motion, finding that the article was not "new evidence."

Defendant's claim on appeal essentially encompasses what he believes to be two distinct district court errors: (1) the decision to allow the prosecution to cross-examine Defendant on the mouthing incident; and (2) the district court's denial of Defendant's motion for a new trial in light of newly discovered evidence, the *Columbus Monthly* article. We affirm both rulings of the district court.

#### 1.      Standard of Review

Both a district court's evidentiary ruling and a district court's decision denying a defendant a new trial based on newly discovered evidence are reviewed for abuse of discretion. *Schraene,* 331 F.3d at 564; *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998). "An abuse of discretion occurs when the district court relies on clearly erroneous findings of fact, improperly applies the law, [] uses an erroneous legal standard,"or where the district court's decision is clearly arbitrary. *In re Brown*, 342 F.3d 620, 633 (6th Cir. 2003) (citation omitted); *see Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 525 (6th Cir. 2005).

#### 2.      Cross-Examination

"[S]poliation evidence, including evidence that defendant attempted to bribe and threaten[] a witness, is admissible to show consciousness of guilt." *United States v. Mendez-Ortiz,* 810 F.2d 76, 79 (6th Cir. 1986) (collecting cases). Furthermore, a district court is permitted to allow evidence of threats to a witness to be admitted even if the district court is not certain that such threats occurred. *United States v. Mattox*, 944 F.2d 1223, 1230 (6th Cir. 1991). Witness intimidation may take many forms. To determine whether conduct or a statement actually constitutes an attempt to intimidate requires factual determinations that the district court is in the best situation to assess. A certain relationship between two parties could render the statement "I hate you" a form of psychological intimidation. We decline to second guess the district court's conclusion that, in the circumstances presented in this case, mouthing "I hate you" constituted an attempt at witness intimidation. Accordingly, we hold that the district court did not abuse its discretion in allowing the cross-examination.

#### 3.      Motion for a New Trial

Similarly, the district court did not abuse its discretion in denying Defendant's motion for a new trial based on newly discovered evidence pursuant to Rule 33. To prevail on a motion for a new trial based on newly discovered evidence pursuant to Rule 33 of the Federal Rules of Criminal Procedure, a defendant must establish: "(1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal."

*United States v. Glover*, 21 F.3d 133, 138 (6th Cir. 1994) (citing *United States v. O'Dell*, 805 F.3d 637, 640 (6th Cir. 1986)). In this case, Defendant presented no new evidence likely to produce an acquittal, and accordingly, was not entitled to a new trial based on new evidence. A juror's conduct during deliberations is not evidence likely to produce acquittal at a new trial because it would not be admissible. Rule 402 of the Federal Rules of Evidence permits only "relevant" evidence, which is defined by Rule 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more likely than not." Inasmuch as juror conduct has no tendency to make Defendant more or less guilty, it is not relevant to a trial on Defendant's guilt.

Despite the fact that Defendant styled his motion as one for a new trial pursuant to Rule 33 on the basis of newly discovered evidence, we presume that Defendant intended to move for a new trial in the interests of justice more generally, offering his "new evidence" as evidence of the need for a new trial rather than as evidence in support of his innocence. Even if we construe Defendant's motion as one for a new trial in the interests of justice, however, Defendant would not be entitled to relief. Confrontation Clause violations are subject to harmless error analysis and do not constitute reversible error unless they "had substantial and injurious effect or influence in determining the jury's verdict." *Doan v. Brigano*, 237 F.3d 722, 736 (6th Cir. 2001), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003). Assuming without deciding that actions of the three jurors in the instant case violated Defendant's Sixth Amendment right to confront witnesses against him, the violation was harmless. Defendant's ex-wife and best friend both testified that Defendant tipped them on the buyout and then lied about it, and numerous friends and relations of Defendant bought enormous amounts of stock in the three month period after Defendant learned of the buyout and before the buyout actually occurred. In light of the overwhelming evidence of Defendant's guilt, we do not believe that the alleged juror misconduct had a substantial and injurious effect on the jury's verdict.

To show that the juror misconduct was not harmless, the Defendant improperly relies on the *Columbus Monthly* article, which quotes one juror as stating that, after discussing Defendant's denial of mouthing "I hate you," Defendant's "'fate was virtually sealed from my perspective,'" (J.A. at 972). First, Federal Rule of Evidence 606(b) prohibits the introduction of this statement or any similar statement to impeach the jurors' verdict. Although a juror may testify about extraneous, prejudicial information brought into the deliberations, the juror may not testify about his or her own mental processes, *i.e.*, how the jury reached his or her verdict. *Doan*, 237 F.3d at 732. The quote relied upon to prove prejudice clearly states that the denial affected the juror's personal "perspective." (J.A. at 972.) Thus, the statement constitutes inadmissible evidence of a juror's mental impressions. Moreover, the statement does not provide any basis for holding a hearing on the issue of prejudice because no jurors' mental impressions are admissible to prove such prejudice. Fed. R. Evid. 606(b). In other words, although federal courts may consider juror testimony to determine whether an error actually occurred, federal courts must determine whether error was harmless from the perspective of the rational juror, not from the perspective of the individual jurors in a particular case. *See Doan*, 237 F.3d at 736 (applying traditional harmless error analysis to juror misconduct case). Second, the article actually suggests that the incident was not prejudicial. The juror also informed the *Columbus Monthly* that "the jury found the testimony and evidence to be 'pretty straightforward'" and that "she and other members of the jury found Jack Kahl's testimony compelling." (J.A. at 972.) These comments indicate that the jurors' misconduct, if any, was harmless because the jurors would have convicted Defendant regardless of whether any misconduct actually occurred.

**H.      Cumulative Error**

Defendant argues that even if each of the alleged errors discussed above does not individually constitute reversible error, the cumulative effect of such errors rendered his trial fundamentally unfair in violation of due process. Because we believe that Defendant received a fair trial, we affirm the district court's order of conviction.

As this Court has held on previous occasions, "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983); *see also United States v. Hines*, 398 F.3d 713, 719 (6th Cir. 2005) (citing *Walker*). In the instant case, however, the cumulative prejudice of trial errors did not render Defendant's trial fundamentally unfair. As discussed in conjunction with Defendant's other arguments on appeal, the only errors that even arguably occurred at Defendant's trial were the exclusion of witness testimony about rumors, a slight variance between the indictment and the proof at trial, improper limits on the cross-examination of Stephan-Blackwell, and potential juror misconduct in the form of improper testimony during deliberations. Defendant's remaining allegations of error are meritless. Considering only the exclusion of the rumor testimony, the alleged variance, the limits on Stephan-Blackwell's cross-examination, and the alleged juror misconduct, we do not find any prejudice rendering Defendant's trial fundamentally unfair. As previously discussed, the testimony regarding rumors was cumulative of other testimony, the limitations on the cross-examination of Stephan-Blackwell did not impair Defendant's ability to conduct his defense, any variance was harmless because jurors are presumed to follow instructions, and any juror misconduct was unlikely to have truly affected the guilty verdict. Moreover, as should be clear at this point, the evidence of Defendant's guilt was overwhelming. His ex-wife and his good friend both testified that he tipped them and lied to the SEC. Additionally, numerous friends and relations of Defendant bought enormous amounts of stock in the three month period between Defendant's learning of the pending buyout and its occurrence. Accordingly, we affirm Defendant's convictions.

**I.      Defendant's Fine**

Defendant challenges his fine on three grounds: (1) that the district court imposed a sentence that was excessive because it was eight times the maximum guideline amount; (2) that the district court improperly considered Defendant's financial resources in assessing the fine; and (3) that the fine was disproportionate in violation of the Eighth Amendment.

**1.      Preservation and Standard of Review**

This Court reviews the district court's imposition of a fine as a part of a defendant's sentence for abuse of discretion. *See United States v. Gibson*, 409 F.3d 325, 342 (6th Cir. 2005) (citation omitted). Where Defendant fails to preserve a challenge to a fine, however, it is reviewed for plain error. *Bostic*, 371 F.3d at 873. "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Abboud*, 438 F.3d at 583.

In this case, Defendant preserved his challenges to the district court's assessment of a fine outside the guideline range by objecting to the government's recommended fine of $ 908,000 (based on amount of loss) in the Pre-Sentence Report, and objecting to an upward departure at the sentencing hearing. Defendant has not, however, preserved his Eighth Amendment challenge to the fine or his challenge premised on the district court's allegedly improper consideration of his financial resources in assessing the fine. Accordingly, we review Defendant's challenge to the

district court's assessment of a fine outside the guideline range for abuse of discretion and Defendant's remaining challenges for plain error and find no abuse of discretion or plain error.

### 2.          The District Court Did Not Abuse Its Discretion or Commit Plain Error

The district court did not abuse its discretion or commit plain error in imposing a $1,000,000 dollar fine on Defendant. The comments to the Sentencing Guidelines indicate that an upward departure may be warranted where two times the amount of loss resulting from the offense exceeds the maximum guideline fine. U.S. Sentencing Guidelines Manual § 5E1.2, comment 4 (2006). In this case, the district court determined that the resulting loss was approximately $908,000. Inasmuch as twice $908,000 equals $1,816,000 and $1,816,000 exceeds the maximum recommended fine ($125,000), the district court did not abuse its discretion in departing upward. Moreover, the amount the district court departed upward was perfectly reasonable. It accounted for the estimated loss resulting from Defendant's conduct. Next, 18 U.S.C. § 3572(a) permits a district court to consider a defendant's financial resources in assessing fines. Therefore, the district court committed no error, let alone plain error, in considering Defendant's ability to pay. Finally, the $1,000,000 dollar fine is not excessive in violation of the Eighth Amendment. A punitive fine violates the Eighth Amendment's "Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The fine in this case is not disproportionate to the gravity of the offense inasmuch as it is equal to the loss caused by the offense. Therefore, the district court did not commit plain error in imposing it. Accordingly, we affirm the district court's imposition of the fine.

### J.          Term of Supervised Release

### 1.          Preservation and Standard of Review

Defendant failed to preserve this issue for review by objecting to its imposition at sentencing. Therefore this Court reviews for plain error. *United States v. Kingsley*, 241 F.3d 828, 836 (6th Cir. 2001).

### 2.          The Imposition of the Term Was Not Plain Error

Defendant has not established that the district court's imposition of a special condition prohibiting Defendant from "profit[ting] in any way from the production of books, movies, or any other media products that may occur as a result of his involvement in the instant offense" for the duration of his supervised release was plain error. Assuming, without deciding, that the imposition of the term in this case constituted error, we do not find that the error was "plain" or obvious. Although this Circuit has not directly spoken on this issue, at least one Circuit has upheld the imposition of an identical provision. *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir. 1988). At a minimum, the Ninth Circuit's decision indicates that reasonable minds could differ as to the legality of the disputed condition, and any error was therefore not "plain." We therefore affirm the district court's imposition of the disputed term.

### K.          Amount of Loss Calculation

### 1.          Standard of Review

We review the district court's calculation for clear error, *United States v. Guthrie*, 144 F.3d 1006, 1011(6th Cir. 1998). Finding no clear error, we affirm the district court's amount of loss determination.

### 2.        **The Amount of Loss Calculation Was Not Clearly Erroneous**.

The district court's determination that the loss amount caused by Defendant's conduct was $908,853.02 was not clearly erroneous. The sole basis for Defendant's contention that $908,853.02 constitutes a clearly erroneous amount is that it includes loss amounts attributable to persons acquitted of insider trading, Voss and Jack, and persons not named in the indictment. First, the district court was not prohibited from including amounts attributable to the trading of Voss and Jack simply because they were acquitted. The acquittal simply means the jury did not find that Voss and Jack committed insider trading beyond a reasonable doubt. The district court in this case, however, only needed to determine the amount of loss by a preponderance of the evidence. *See United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005) (holding that the same evidentiary standards apply post-*Booker*); *United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004) (holding that the district court determines the amount of loss under the preponderance of the evidence standard). Accordingly, the district court's inclusion of the amount attributable to Voss' and Jack's trading is not clear error. Second, the district court is not prohibited from considering facts not included in the indictment. *See United States v. Booker*, 543 U.S. 220, 249-255 (2005). Thus, it did not commit clear error simply because it included loss amounts attributable to the trading of persons not named in the indictment. Therefore, we affirm the district court's amount of loss calculation.

## L.        Section 3553 Analysis

Finally, Defendant asks this Court to vacate his 72 month sentence and remand for resentencing on the ground that the district court failed to consider all the relevant § 3553 factors. Specifically, Defendant contends that the district court failed to consider the following factors despite Defendant's submission of a sentencing brief, arguing that the factors constituted grounds for a lower sentence: (1) Defendant's personal history; (2) the lack of any need to protect the public; (3) the lack of any need to deter Defendant; and (4) the allegation that Defendant did not commit his crime for personal monetary gain. For the reasons set forth below, we affirm the imposition of a 72 month period of incarceration.

### 1.        **Preservation and Standard of Review**

We review Defendant's claim for plain error because Defendant failed to object to the district court's § 3553 analysis at the sentencing hearing, despite the fact that the district court provided Defendant with the opportunity to object. *United States v. Bostic*, 371 F.3d 865, 873 (6th Cir. 2004). "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Abboud*, 438 F.3d at 583.

### 2.        **The District Court Did Not Commit Plain Error**

The job of the district court is to impose "'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)." *Foreman*, 436 F.3d 63, 640 (6th Cir. 2006)(quoting 18 U.S.C. § 3553). In reaching a sentence that complies with the purposes of § 3553(a), the district court must consider the Sentencing Guidelines range and all relevant § 3553 factors. *Id.* While a district court need not explicitly reference § 3553 or recite a list of factors, it must provide a reasoned explanation for its choice of sentence and its explanation must be sufficiently thorough to permit meaningful appellate review. *Id.* Additionally, "[w]here a defendant raises a particular argument in seeking a lower sentence, the record must both reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." *United States v. Vonner*, — F.3d — , 2006 WL 1770095, at * 6 (6th Cir. June 29, 2006); *United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006).

This Court will only uphold a sentence if it is reasonable. Reasonableness contains two facets: substantive and procedural. *See United States v .Webb*, 403 F.3d 373, 383 (6th Cir. 2005); *United States v. Jones*, 445 F.3d 865 (6th Cir. 2006) (Moore, J., dissenting on the ground that the majority opinion conflicted with prior Circuit precedent). In reviewing for reasonableness, this Court employs a presumption of substantive reasonableness. *United States v. Williams*, 436 F.3d 706, 708 (2006) (holding presumption of reasonableness exists, but still noting that a district court must consider the § 3553 factors). That is, this Court presumes that the district court imposed a sentence of the appropriate length. However, this Court will not presume that a district court employed the proper procedures – a reasoned consideration of all relevant § 3553 factors – in reaching it sentence. *Webb*, 403 F.3d at 383; *Foreman*, 436 F.3d at 644. In other words, the presumption of reasonableness does not "mean that a guidelines sentence will be found reasonable in the absence of evidence in the record that the district court considered all of the relevant section 3553(a) factors." *Id.*

In this case, the district court did not commit plain error in sentencing Defendant to 72 months incarceration. First, contrary to Defendant's contentions, the district court did consider Defendant's personal history, the lack of any need to protect the public, and the lack of any need to deter Defendant from committing insider trading in the future. The district court explicitly considered Defendant's personal history, but simply found that it did not warrant a lighter sentence. The court explained:

> [Defendant] was not only a noted expert in his field, but also a gifted teacher, and was revered by his students, many of whom have modeled their careers after his own and have taken his advice and counsel as valuable tools to be used by them in the conduct of their own careers, and by engaging this illegal activity, and engaging in the obstruction of justice to cover it up, he has tainted forever his credibility. And one wonders just what effect that's going to have on the many students who have placed their trust and confidence in his counsel and advice. This is indeed an unfortunate consequence of his offense conduct.

(J.A. at 3947.) Thereafter, the district court expressly recognized that there was no need to deter Defendant or protect the public from Defendant but that a need did exist to deter others from committing similar crimes. The court stated:

> The need for the sentence in this case to afford adequate deterrence, and it is not deterrence of Professor Blackwell, I doubt he will ever again engage in activities of this kind, or indeed have the opportunity to do so, but it's to deter other similarly situated from engaging in this kind of conduct that's a primary sentencing factor.

(J.A. at 3949.) Additionally, the court recognized that this was a serious offense that did indeed have victims, including Defendant's friends and family, holders of WF stock who sold to insiders, and Ohio State University. Inasmuch as future crimes by others would also presumably have victims, the court clearly believed there was a need to protect the public or at least our economic and justice systems. (J.A. at 3946, 3949 "[Defendant's] offense strikes at the heart of the integrity of a main part of the free enterprise system." and "[Defendant's obstruction of justice] seriously undermine[d] respect for the system of justice.")

Next, although the district court failed to consider Defendant's contention that he did not commit his crimes for personal monetary gain in imposing 72 months of incarceration, we cannot say that this failure constituted plain error. To establish plain error, Defendant must show not only that an obvious error occurred, but also that the error affected the integrity of the judicial proceedings. *Abboud*, 438 F.3d at 583. The district court's failure to consider Defendant's contention that he did not commit his crimes for personal monetary gain in imposing 72 months of

incarceration was an obvious error inasmuch as the black letter law of this Circuit requires district courts to consider all factors brought to their attention by a defendant. *Vonner*, — F.3d — , 2006 WL 1770095, at \*6; *Richardson*, 437 F.3d at 554. Furthermore, we do not believe that this error was remedied by the district court's consideration of Defendant's lack of financial motivation in calculating the advisory guidelines and in assessing Defendant's fine. Consideration of Defendant's motive in calculating the guidelines range or in assessing the fine is not an adequate substitute for consideration of Defendant's motive in assessing the proper period of incarceration. If considering Defendant's motive in assessing the guidelines range were an adequate substitute for considering Defendant's motive in determining the proper period of incarceration, the guidelines would become de facto mandatory. Additionally, Defendant's financial motives may bear differently on the proper fine than the length of incarceration. Most importantly, however, in arguing that his non-financial motive was relevant to the § 3553 analysis, Defendant was arguing not only that he receive a lighter fine, but also that *his incarceration be shorter*, and this argument was never considered by the district court.

This error, however, did not affect the fairness, integrity or public reputation of the judicial proceedings. The trial court's error was procedural, not substantive. Importantly, the district reached a substantively reasonable sentence by thoroughly and thoughtfully considering Defendant's personal history and the nature of Defendant's illegal actions. While the district court skipped a procedural step in reaching the sentence in question, in the circumstances of this case, that misstep did not affect the outcome. Therefore, we affirm the district court's imposition of 72 months of incarceration.

## III.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Defendant's convictions and sentence.