**BLACKWELL**

v.

**GORMAN et al.**

Court of Common Pleas of Ohio,
Franklin County.

No. 06CV A09–12617.

Decided March 8, 2007.

Cooper & Elliott, L.L.C., Rex H. Elliott, Charles H. Cooper Jr., and John C. Camillus, for plaintiff.

Bieser, Greer & Landis, L.L.P., and David C. Greer; Williams & Connolly, L.L.P., John K. Villa, and Craig D. Singer, for defendants.

---

FRYE, Judge.

## I. *Introduction*

{¶ 1} In the wake of his federal conviction for insider trading of securities, Roger D. Blackwell, Ph.D., brought this legal-malpractice case against his trial lawyer Thomas O. Gorman. Also sued was Gorman's law firm of Porter, Wright, Morris & Arthur, L.L.P. ("Porter Wright").

{¶ 2} Plaintiff's criminal jury trial in the United States District Court for the Southern District of Ohio lasted five weeks. His 2005 conviction was sustained in posttrial rulings by District Judge James L. Graham and upheld on appeal. *United States v. Blackwell* (C.A.6, 2006), 459 F.3d 739. On February 20, 2007, the United States Supreme Court denied Blackwell's petition for a writ of certiorari. *Blackwell v. United States*, Supreme Court No. 06–885, —— U.S. ——, 127 S.Ct. 1336, 167 L.Ed.2d 84. The fact that postconviction proceedings might yet be undertaken under Section 2255, Title 28, U.S. Code does not prevent the existing judgment, fully exhausted on direct appeal, from being regarded as a final resolution on the merits. 63 Ohio Jurisprudence 3d (2003), Judgments

Section 351; *Cully v. Lutheran Med. Ctr.* (1987), 37 Ohio App.3d 64, 523 N.E.2d 531; *Hapgood v. Warren* (C.A.6, 1997), 127 F.3d 490, 494, fn. 3.

{¶ 3} Blackwell's complaints about his lawyers include assertions that Porter Wright misled him about its expertise in the defense of white-collar criminal cases, mishandled negotiations with the government, did a poor job trying his criminal trial, unduly pressured him into firing co-counsel experienced in criminal cases, required him to post substantial financial security for his legal fees on the eve of trial, and charged a clearly excessive legal fee, all while losing his case. Inherent in many of his arguments is the allegation that the federal judgment was wrong and that he is actually innocent of the government's charges. For its part, Porter Wright has counterclaimed, seeking over $2.7 million in unpaid fees and expenses.

{¶ 4} Following an initial conference with the court, defendants filed a motion for summary judgment on December 15, 2006. Plaintiff responded on January 12, 2007; a reply memorandum was filed on January 25.[1] Plaintiff filed a motion to supplement the factual record on February 15, 2007, which was unopposed and is hereby granted. That brings before the court fees statements memorializing legal work performed by Porter Wright after trial during the fall of 2005 and within one year prior to the filing of this suit. That legal work was contemporaneously billed to Blackwell. The professional work performed within one year prior to suit has implications for the statute-of-limitations defense asserted by defendants.

{¶ 5} Defendants seek summary judgment premised upon the one-year statute of limitations for legal-malpractice claims in Ohio, and upon arguments tied to the criminal conviction. The facts relevant to the conviction and to the statute of limitations are not genuinely disputed. (For example, the verdict forms are filed with the Singer affidavit at tab I.) Accordingly, the court has concluded that defendants' motion is properly granted in part.

## II. *Factual Background*

{¶ 6} Prior to his conviction, Blackwell was a prominent professor at the Business School of The Ohio State University. His expertise and reputation were widely known, and he frequently was invited to serve as a director of publicly traded companies. Complaint, ¶ 6–7.

{¶ 7} Blackwell's legal difficulties arose from a 1999 tender offer by the Kellogg Company. It sought to acquire the stock of Worthington Foods, a small

---

1. Due to an ongoing murder trial, the court canceled oral argument on defendants' motion. Following further review of the extensive briefs, the court concludes that arguments are unnecessary.

natural-foods company headquartered in Franklin County. Blackwell was a member of the board of the target company, Worthington Foods, between 1992 and 1999. Complaint, ¶ 8. When that transaction closed, Kellogg "paid stock-holders a premium over the prior trading price of Worthington Foods stock." Id. at ¶ 15. Those having foresight, or given material inside information about the potential Kellogg acquisition, profited. Therein lies the tale.

{¶ 8} Once Kellogg initiated negotiations toward a possible buyout of Worthington Foods ("WF"), Blackwell and his fellow board members became privy to information about Kellogg's interest before that information became public. The government alleged in the criminal case that, in violation of obligations owed under the securities laws of the United States, Blackwell tipped inside information pertinent to the possible transaction involving WF to nine people.[2] Allegedly, they then bought WF stock before Kellogg's offer became public, gaining a financial premium on their stock. 459 F.3d at 749. At his criminal trial in 2005, Blackwell premised at least a part of his defense on the view that WF was subject to widespread speculation in the marketplace that a larger company might undertake a buyout and that such general awareness of the potential profit to be made in WF stock fully explained the trading in question.

{¶ 9} Allegedly, Blackwell informed Jack Kahl, "a long-time friend and business associate," that "Kellogg was going to buy out WF and that Kahl should buy WF stock." 459 F.3d at 749–750. Blackwell claims, in response in this case, that "the testimony of Jack Kahl (a witness who testified pursuant to an immunity agreement in order to avoid prison time himself)" played a large part in his conviction even though it was false. Complaint, ¶ 34–35.

{¶ 10} Blackwell's marital status is another prominent point in the story. He was married at the time of the Kellogg transaction in 1999 but had divorced by the time of his criminal trial in 2005. His ex-wife (Tina Stephan Blackwell, now remarried and called "Mrs. Lundgren" in the complaint) occupied a major role in the criminal trial. Hours after signing final separation papers in their domestic-relations case, Lundgren apparently changed testimony she had previously given under oath to the Securities and Exchange Commission ("SEC") in a civil investigation of the WF tender offer. Once a favorable witness, according to Blackwell, she became one of the government's leading witnesses against him. Id. Blackwell says his ex-wife was herself guilty of tipping family members but

---

2. In passing, the court observes that some background or procedural facts are most readily understood using sources outside the pleadings. None appear genuinely disputed. Accordingly, some information gleaned from opinions of the district court, the published opinion of the court of appeals, and the petition for a writ of certiorari is cited hereinafter. In resolving this motion, however, the court has construed all disputed facts and the inferences drawn from the undisputed facts most favorably to Blackwell.

gained immunity from the government in exchange for her cooperation.[3] Complaint, at ¶ 13–14, 17, 19; Answer, ¶ 19–20; *United States v. Blackwell* (Dec. 14, 2005), S.D. Ohio No. 2:04–CR–134, 2005 WL 3440880 ("Opinion, 12–14–05"), filed with the Singer affidavit in this case on December 15, 2006, at tab C, 2005 U.S. Dist. LEXIS 35939.

{¶ 11} As the Sixth Circuit summarized the record, Blackwell's ex-wife testified that "she and [Blackwell] gave her parents money to buy WF stock," that "both she and Blackwell lied to the NASD and the SEC about the tipping," and that their e-mail records were deleted and other conduct occurred to "withhold information and obscure their relationships with parties who bought WF stock." *Blackwell,* 459 F.3d at 750.

{¶ 12} To fully understand the complex interplay between proof at the criminal trial and plaintiff's allegations in this civil case, additional mention should be made of Lundgren's parents. According to plaintiff, they "testified before the SEC that they were not tipped by Plaintiff." Complaint, ¶ 35. However, Porter Wright "either forgot or simply failed to issue subpoenas to Tina Lundgren's parents to compel them to repeat that testimony at trial. These crucial witnesses fled to Europe during the trial and, therefore, could not be called as trial witnesses to establish that their daughter—the government's key witness—had given false testimony." Id. Thus, plaintiff now seeks to offer evidence in this malpractice case that the ultimate outcome of his federal trial would have been favorably influenced by the testimony of Lundgren's parents, who were never witnesses for any party, if only his lawyers had made it available.

{¶ 13} This illustrates the speculative nature of the actual-innocence claim, for the exact effect of the parents' hypothetical testimony and how it might have intersected with or contradicted Lundgren's testimony or affected her credibility can never truly be known. None of this ever came up before the jury. The government informed defense counsel about the parents' immunity agreement, and provided them the immunity letter shortly after Lundgren testified. Although Lundgren's parents were not government witnesses, this apparently was disclosed in order to cure any possible prejudice if the immunity arrangement were later found to constitute *Brady* material (see, generally, *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215). Furthermore, the government agreed to bring Lundgren back to Columbus from New York City to testify further about the effect, if any, of her parents' immunity arrangement. Judge Graham agreed to allow the defense to recall Lundgren. For reasons not explained in this record as of yet, the defense chose not to put Lundgren back on

---

3. It appears undisputed that Lundgren and her parents all received immunity from the government, delivered only one day after her separation agreement was signed formalizing a $1 million marital settlement with Blackwell in August 2004. Answer, at ¶ 20.

the witness stand. On the legal issue, Judge Graham concluded (and the Sixth Circuit affirmed) that no *Brady* violation occurred. Opinion and Order by District Judge Graham, case No. 2:04–CR–134, Nov. 18, 2005, at 18–19, 2005 WL 3113060 ("Opinion, 11–18–05"), filed with the Singer affidavit, at tab B; *Blackwell*, 459 F.3d at 759. The more important point, which Judge Graham pointedly recognized, was that "[d]efendants made the tactical decision not to engage in further cross-examination of Ms. Blackwell" about her parents' immunity. Opinion, 11–18–05, at 19.

{¶ 14} In short, Blackwell faced a complex trial involving a substantial number of highly educated witnesses and prominent defendants, hotly contested issues of credibility, interest, or bias, a story involving a good deal of money, and circumstantial evidence surrounding the end of his marriage and WF stock trading by the "circle of friends, business associates, and family around him who traded in WF stock during the Kellogg Window—the Accused Traders." Petition for writ of certiorari at 10. All these difficult questions were presented to, weighed by, and resolved by the jury in the criminal trial.

{¶ 15} Not yet of record in this case is evidence documenting very much about the attorney-client relationship between the parties, such as the number and scope of consultations between lawyer and client during the criminal trial, the sharing of any knowledge gained by counsel from interviewing government witnesses, the nature of any plea arrangement tendered for Blackwell's consideration, and the like. The complaint asserts that Porter Wright did little good work and that Blackwell was not meaningfully consulted about preparing his own defense; of course, those notions are disputed and the federal judgment has not been vacated for ineffective assistance of counsel. The point is, trial and posttrial proceedings in *United States v. Blackwell*—as in every trial of any complexity—involved innumerable tactical and strategic choices by the lawyers and sometimes by the parties, culminating in difficult decisions by a jury and multiple judges. Choices appear brilliant when they result in a favorable decision but ill-considered or worse in another light. Beyond all of that, Blackwell's trial was not unusual in that at least one wholly unexpected incident occurred. Some thought that Blackwell mouthed the words "I hate you" at his ex-wife in full view of members of the jury. Opinion, 12–14–05, at 3. The lengthy opinions rendered in *United States v. Blackwell* tell that story more fully, too. It suffices for present purposes that the reader appreciate that in asserting actual innocence, Blackwell invites reexamination of a whole host of difficult factual issues, against the backdrop of a very lengthy federal trial that can never truly be replicated.

### III. *Blackwell's Actual–Innocence Claim*

{¶ 16} Plaintiff's claims essentially fall into two categories. First, as already mentioned, he asserts legal malpractice premised upon his actual innocence.

From the very first line in his complaint, Blackwell pleads that "defendants' multiple acts of legal malpractice * * * have cost plaintiff his freedom and have ruined his extraordinary professional reputation" resulting "in his conviction and subsequent imprisonment." Complaint, unnumbered introductory paragraph. In the second category, Blackwell says that his trial lawyers poorly represented him so that, apart from conviction and imprisonment, he was financially damaged. Some arguments rather clearly fall into one category or the other; others blend features of both.

{¶ 17} In asserting actual innocence, Blackwell flatly states that "[n]o one received any tips from plaintiff." Complaint, ¶ 17. He points out in paragraph seven of his complaint that, having had decades of experience as a member of boards of directors of publicly traded companies, he "was well aware of his legal obligation not to disclose material, nonpublic information to third parties" at the time of the events in question. Once again, he "never once violated his legal duty to refrain from disclosing material, nonpublic information" and "steadfastly followed every legal and ethical obligation imposed on him." Id. at ¶ 10.

{¶ 18} Other allegations are tied indirectly to the claim of actual innocence. For instance, as to his ex-wife Lundgren, plaintiff gratuitously alleges that she exhibited an unsavory personal life while still married to him. Perhaps this was raised because her past behavior might in some way reflect upon her credibility as a criminal witness. Beyond that, Blackwell says she testified at his trial only out of self-interest. Complaint, ¶ 12.[4] Indeed, plaintiff infers that his ex-wife actually tipped several persons to buy WF stock because "[s]he observed that Special Board meetings were taking place and apparently overheard Plaintiff as he participated in Special Board meetings by telephone conference." Id. at ¶ 17–19. Despite such misdeeds, Lundgren and her parents received immunity from the government. Id. at ¶ 19. Meanwhile, Blackwell resides in a federal prison for 72 months. *Blackwell,* 459 F.3d at 748.

## IV. *Other Issues Raised in the Complaint*

{¶ 19} Blackwell challenges the "nearly $6,000,000" he has been charged for legal fees and related to it the quality of his lawyers' work and what he says was a misrepresentation of the lawyers' expertise in trying cases of this kind. Complaint, ¶ 24, 26, 27, 29, and 31. Additional allegations not squarely tied to the actual-innocence claim include that Porter Wright failed to warn plaintiff "concerning the likelihood of an SEC civil proceeding against him or the likelihood of a criminal action being brought." Complaint, ¶ 36, last unnumbered bullet point.

---

4. Among the places at which the credibility and potential bias of Lundgren have been specifically examined are the Sixth Circuit decision, 459 F.3d at 757, and Judge Graham's 11–18–05 Opinion at 15–16.

Given Blackwell's self-professed "decades of experience as a corporate director" (Complaint, ¶ 7) it may seem farfetched to some that he should urge that he knew nothing about possible SEC enforcement proceedings without being specially cautioned by his lawyers, but that factual issue is not yet developed in the record. Somewhat more plausible, perhaps, is plaintiff's allegation that "defendants negligently failed to make appropriate offers to settle the criminal charges or to inform Plaintiff about offers that were made. Had defendants done this, the Government never would have charged Plaintiff with any crime." Id. at ¶ 25, and 36, first unnumbered bullet point. Additionally it is asserted that "Attorney Gorman misrepresented his criminal defense trial experience to Plaintiff" but then "required Plaintiff to fire the only experienced criminal defense lawyer on the team shortly before trial." Complaint ¶ 36, second and third unnumbered bullet points. If such acts were proven, they might be found actionable, even accepting that Blackwell was guilty of every criminal charge on which he was convicted. As *Krahn v. Kinney* (1989), 43 Ohio St.3d 103, 538 N.E.2d 1058, and *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 674 N.E.2d 1164, implicitly recognized, a criminal defendant who actually is guilty may well need a better lawyer than one who is innocent. Sometimes resolving a case by a plea bargain or some other creative strategy may minimize the cost and delay, if not also the potential penalties associated with conviction.

{¶ 20} Understandably, many facts remain shrouded in the secrecy of the attorney-client privilege due to the only recently concluded direct appeal of the criminal case. Nevertheless, because a sizeable part of Blackwell's legal-malpractice claim is squarely predicated upon arguing actual innocence, and because his conviction is undisputed, the effect of that judgment in this civil case may properly be addressed. Likewise, there is no genuine dispute of material fact precluding a decision on the statute-of-limitations defense urged by defendants.

## V.  *Legal–Malpractice Claims for Criminal–Trial Work*

{¶ 21} Blackwell vigorously asserts that in charging legal malpractice, he is entitled to disregard the final judgment reached by the United States District Court and recover damages because his trial lawyers failed to secure his acquittal. In practical terms, he proposes to have a trial over things like whether "defendants failed to competently address the scripted testimony of Tina Stephan and Jack Kahl." Plaintiff admits that such issues are complicated and that "this factual dispute cannot be resolved before [pretrial] discovery even commences" in this civil case. Plaintiff's memorandum filed Jan. 12, 2007, at 12.

{¶ 22} *Krahn* and *Vahila*, supra, both rejected the argument that a legal-malpractice plaintiff is obligated to obtain outright reversal of a conviction before he may pursue a malpractice action. E.g., *Krahn*, 43 Ohio St.3d at 105, 538

N.E.2d 1058. In so holding, however, *Krahn* also discussed the doctrine of collateral estoppel as it might apply to a criminal conviction and explicitly recognized that "in most cases the failure to secure a reversal of the underlying criminal conviction may bear upon and even destroy the plaintiff's ability to establish the element of proximate cause" in a legal-malpractice setting. Id. at 106, 538 N.E.2d 1058. The interplay between these two concepts lies at the heart of Blackwell's proposed innocence claim.

### A. *Practical Questions*

{¶ 23} Before further examining the available precedents, it seems prudent to pose several practical questions inherent in Blackwell's position that, despite a full trial and appeal, he remains entitled to simply disregard his conviction. Procedurally, Blackwell necessarily assumes that a trial judge sitting in a separate court system, assisted at some point by a jury, is fully entitled to rehear the mountain of evidence that has already been fully explored in *United States v. Blackwell.* One may justifiably ask, just exactly how many trials is Blackwell entitled to receive? Beyond that superficial response, under the legal principle of comity, is not substantial deference due to the serious work already invested by a 12–person federal jury, District Judge Graham, and the Sixth Circuit? Coupled with that, what is a jury in this case to make of the fact that Blackwell was convicted using the heightened standard of proof beyond a reasonable doubt applicable in criminal cases, while enjoying the protections of the Confrontation Clause, the right to legal counsel that was not ineffective in his defense, and other procedural rights that attach only in a criminal trial?

{¶ 24} To reach its verdict, the federal jury weighed substantial circumstantial evidence, made difficult decisions on the credibility of witnesses, and confronted other subtle and not-so-subtle choices. They grappled with the bias—if any—evidenced by Lundgren's change of testimony that apparently occurred only after her personal financial arrangements had been finalized in the divorce proceedings and she and her parents had gained immunity. Why is the verdict by that jury to be viewed with suspicion, much less cast aside in favor of the view of another jury yet to be empaneled? The predicate for the actual-innocence claim in this court is that the federal courts simply got it all wrong, due to the inept performance by Porter Wright, in regard to things like how "[d]efendant Gorman conducted an incomplete, ineffective, and wholly inadequate cross-examination of Plaintiff's ex-spouse, who was the prosecution's star witness." Complaint, ¶ 36. But how is a new jury to gauge the real impact of such things during a five-week trial, particularly when not only Porter Wright but also other defense lawyers actively participated in behalf of the multiple codefendants? Are all "tactical decisions," as Judge Graham aptly termed them, to be laid at the feet of Porter

Wright merely because Blackwell was convicted, while some defendants walked free?

{¶ 25} Blackwell would have this court proceed on the assumption that his ex-wife's parents were "crucial witnesses [who] fled to Europe during the trial" but who would nevertheless have testified favorably to him (and consistent with testimony favorable to Blackwell given before the SEC) if only they had been sent subpoenas by Porter Wright before they "fled." Complaint, ¶ 35. One must ask, if they would have given favorable testimony then why didn't the other defense lawyers send them a subpoena, or more fundamentally, why did Lundgren's parents flee rather than perform their civic duty to help justice prevail? Who now can say? Yet it is these sorts of self-serving arguments about inadequate trial preparation and strategy, made from hindsight, that lie at the core of the actual-innocence claim. Complaint, ¶ 9–11.

{¶ 26} Honoring plaintiff's actual-innocence theory would plainly fly in the face of the time-honored rule that " '[t]here must be an end to litigation someday.' " *GenCorp Inc. v. Olin Corp.* (C.A.6, 2007), 477 F.3d 368, 372, quoting *Ackermann v. United States* (1950), 340 U.S. 193, 198, 71 S.Ct. 209, 95 L.Ed. 207. In short, merely to superficially ponder these practical concerns suggests that Blackwell is incorrect in his reading of the Ohio precedents.

## B. *Ohio Law on Legal-Malpractice Claims*

{¶ 27} Assuredly, some uncertainty exists in the *Krahn* line of cases about the preclusive effect of a conviction. Plaintiff creatively argues that "[u]nlike the criminal case, this litigation is not about whether the evidence against Professor Blackwell was substantial; this case is about why the evidence against Professor Blackwell appeared to be substantial. * * * Plaintiff asserts that this was caused by the negligent performance of his counsel. At the appropriate time Plaintiff will present evidence proving that Defendants failed to competently address the scripted testimony of Tina Stephan and Jack Kahl." (Emphasis sic.) Plaintiff's memorandum filed Jan. 12, 2007, at 12. In thus framing his legal-malpractice claim predicated upon actual innocence, the plaintiff ignores his own conduct that led to the insider-trading charges and sees all that is past in the federal system as mere prologue.

{¶ 28} The decisions in two legal-malpractice cases previously mentioned primarily state current law in Ohio. The Ohio Supreme Court recently cited *Vahila* with approval. *Jackson v. Greger,* 110 Ohio St.3d 488, 2006-Ohio-4968, 854 N.E.2d 487, ¶ 17. *Krahn* and *Vahila* are among a number of cases in recent years from jurisdictions across the country that grapple with the interplay between a conviction and a later malpractice claim against the criminal-defense lawyer. A number of those decisions have adopted the so-called exoneration or actual-innocence rule rejected in Ohio, under which civil plaintiffs must secure

some relief from their conviction before instituting a suit based on allegedly negligent performance by their criminal-defense counsel. E.g., *Therrien v. Sullivan* (2006), 153 N.H. 211, 891 A.2d 560 (adopting the exoneration rule); *Rantz v. Kaufman* (Colo.2005), 109 P.3d 132, 135–136 (rejecting the exoneration rule). See, also, *Heck v. Humphrey* (1994), 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383, in which the United States Supreme Court held that there is "no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." Id. at 489, 114 S.Ct. 2364, 129 L.Ed.2d 383, cited with approval in *Wallace v. Kato* (2007), 549 U.S. ——, 127 S.Ct. 1091, 1103, 166 L.Ed.2d 973. In discussing this category of legal-malpractice cases, courts point out that Ohio follows the minority rule. E.g. *Canaan v. Bartee* (2003), 276 Kan. 116, 126, 72 P.3d 911; *Levine v. Kling* (C.A.7, 1997), 123 F.3d 580, 582.

{¶ 29} The syllabus paragraph written by the Supreme Court of Ohio in *Krahn* provided only that "[t]o state a cause of action for legal malpractice arising from criminal representation, a plaintiff must allege (1) an attorney-client relationship giving rise to a duty, (2) a breach of that duty, and (3) damages proximately caused by the breach." 43 Ohio St.3d 103, 538 N.E.2d 1058, syllabus. More important, *Krahn* did not arise following a full trial on the merits. Instead, it addressed an allegedly botched plea bargain. The guilty plea recommended by defense counsel was understood to admit only a minor misdemeanor. In fact, the guilty plea was actually entered to a first-degree misdemeanor, giving rise, according to the malpractice claim, to extra legal fees and expenses incurred in seeking to have the plea vacated and causing other damages. Id. at 104, 538 N.E.2d 1058. When sued, the lawyer claimed that his former client ought to first be required to obtain a reversal of the conviction on grounds of ineffective assistance of counsel before any malpractice case could proceed. Id. at 105, 538 N.E.2d 1058. Justice Herbert Brown wrote for a unanimous court in rejecting that view, based on the facts presented in *Krahn*. Id. (stating that "[t]he inequity of requiring a plaintiff to obtain a reversal of his or her conviction before bringing a malpractice action is apparent from the facts in the present case").

{¶ 30} *Vahila*, supra, embraced the holding in *Krahn*, and rejected any "rule of thumb requiring that a plaintiff, in order to establish damage or loss, prove in every instance that he or she would have been successful in the underlying matter(s) giving rise to the complaint." *Vahila*, 77 Ohio St.3d at 426, 674 N.E.2d 1164. This rejection of a "rule of thumb" could be read to have enlarged upon the holding in *Krahn* somewhat, in that the earlier case primarily addressed only the necessity for vacating the criminal conviction, not actually winning the case.

{¶ 31} Contrary to plaintiff's view, the simplistic "rule of thumb" statement in *Vahila* is not the answer here. Instead, this case is controlled by the second

portion of the *Krahn* opinion addressed to the collateral-estoppel component of the res judicata doctrine. The Ohio Supreme Court held that the original criminal proceedings in *Krahn* were insufficient to invoke collateral estoppel in the later malpractice case because the claimed error by Krahn's criminal lawyer in plea negotiations was not " 'actually and necessarily litigated and determined' in the denial of her motion to vacate the criminal judgment against her." *Krahn,* 43 Ohio St.3d at 108, 538 N.E.2d 1058, quoting *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 195, 2 OBR 732, 443 N.E.2d 978. The Supreme Court by no means suggested that collateral estoppel was completely inapplicable in the context of a criminal conviction when, as here, matters genuinely were litigated and determined. Id. at 107, 538 N.E.2d 1058 (holding that "the facts prevent the invocation of collateral estoppel as a bar to Krahn's cause of action in this case"). Decisions in Ohio other than *Krahn* relative to collateral estoppel (or issue preclusion) are also helpful in understanding the intersection of a criminal conviction after a full trial with a legal-malpractice case like the one presented here.

## VI. *The Collateral-Estoppel Effect of the Federal Judgment*

{¶ 32} At some points the briefs appear to suggest that there may be a difference between the federal res judicata doctrine and its Ohio counterpart, but this court perceives no genuine conflict relevant to the question presented here. To be sure, the United States Supreme Court has explicitly held that "[s]tate courts are bound to apply federal rules in determining the preclusive effect of federal-court decisions on issues on federal law." *Heck,* 512 U.S. at 488, 114 S.Ct. 2364, 129 L.Ed.2d 383, fn. 9. However, that is no answer here. No one could suggest that a state-court finding of actual innocence could undermine Blackwell's conviction and release him from prison. Instead, the real question is the effect of that federal conviction in adjudicating Blackwell's purely state-law claim. In this court's view, the state law of collateral estoppel determines how to treat the federal conviction for state tort-law purposes. As to that, *Heck* offers no guidance.

{¶ 33} Aside from the reliance upon the cryptic references to a rule of thumb in *Krahn* and *Vahila,* Blackwell points out that Porter Wright was not a party to his criminal case and not in privity with him or the government. Memorandum filed Jan. 12, 2007, at 20–21. This raises the so-called mutuality-of-estoppel part of the collateral-estoppel doctrine. In addition, Blackwell argues that Porter Wright did such a poor job representing him that "he did not have a full and fair opportunity to litigate his guilt or innocence in his criminal trial as a result of his attorneys' malpractice." Id. at 19.

{¶ 34} The second issue is easily resolved. "[T]he doctrine of collateral estoppel provides that an issue or a fact that was fairly, fully, and necessarily litigated and determined in a prior action may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different. Collateral estoppel applies when (1) the fact or issue was actually and directly litigated in the prior action, (2) the fact or issue was passed upon and determined by a court of competent jurisdiction, and (3) the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action." (Citation omitted.) *Nye v. Ohio Bd. of Examiners of Architects* (10th Dist.), 165 Ohio App.3d 502, 2006-Ohio-948, 847 N.E.2d 46, at ¶ 13. To the same effect is *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553, 861 N.E.2d 109, ¶ 44. A full and fair opportunity to be heard was plainly afforded Blackwell in federal court. The mere fact that it might have been fuller or fairer from Blackwell's personal vantage point, using hindsight, simply is not the test.

## VII. *The Mutuality Requirement*

{¶ 35} As to mutuality, there is to be sure some recent case law in Ohio declining to use a criminal conviction to bind a defendant in a subsequent civil case based solely upon his prior criminal conviction. E.g., *Phillips v. Rayburn* (4th Dist.1996), 113 Ohio App.3d 374, 381, 680 N.E.2d 1279, followed in *Bukowski v. Hall* (N.D.Ohio 2001), 165 F.Supp.2d 674, 679. Those decisions are inapposite. The issue here is not the offensive use of issue preclusion against Blackwell merely because he was convicted, but the reverse—the defensive use of collateral estoppel or issue preclusion—that Blackwell should be precluded from contesting issues squarely litigated and resolved against him in his federal trial. See *Nye*, supra, 165 Ohio App.3d 502, 2006-Ohio-948, 847 N.E.2d 46, ¶ 13 (holding that the party "against whom collateral estoppel is asserted" must have been a party to the prior action). In Ohio, there no longer is any general requirement that the party asserting collateral estoppel have been a party to the prior action, because a relaxed mutuality standard is now followed.

{¶ 36} The recent decision in *Godale v. Chester Twp. Bd. of Trustees*, 11th Dist. No.2004-G-2571, 2005-Ohio-2521, 2005 WL 1208828, ¶ 41-42, summarized development of the law of res judicata in Ohio:

"In recent years, the court has not limited the application of the doctrine of res judicata to bar only those subsequent actions *involving the same legal theory of recovery as a previous action.*" *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 382 [653 N.E.2d 226]. "It has long been the law of Ohio that 'an existing final judgment or decree between the parties to litigation is conclusive as to all claims which were *or might have been* litigated in a first lawsuit.'" (Emphasis

sic.)  *Natl. Amusements, Inc. v. Springdale* (1990), 53 Ohio St.3d 60, 62 [558 N.E.2d 1178], quoting *Rogers v. Whitehall* (1986), 25 Ohio St.3d 67, 69 [25 OBR 89, 494 N.E.2d 1387].  Moreover, according to the Supreme Court of Ohio, the doctrine of res judicata requires a plaintiff to present every ground for relief in the first action, or be forever barred from asserting it.  *Natl. Amusements, Inc.* at 62 [558 N.E.2d 1178].

The Supreme Court of Ohio stated, "today, we expressly adhere to the modern application of the doctrine of res judicata * * * and hold that a valid, final judgment rendered upon the merits bars all *subsequent* action based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action."  (Emphasis added.)  *Grava* at 382 [653 N.E.2d 226].

■  {¶ 37} *Davis v. Wal–Mart Stores, Inc.* (2001), 93 Ohio St.3d 488, 491, 756 N.E.2d 657, illustrates the other side of the coin—that the res judicata doctrine does not bar litigation of a claim that could not have been asserted in a prior lawsuit.  See, also, *Westchester Estates, Inc. v. Bacon* (1980), 61 Ohio St.2d 42, 46, 15 O.O.3d 53, 399 N.E.2d 81.  *Krahn,* supra, also recognized that same limitation on issue preclusion.  43 Ohio St.3d at 107–108, 538 N.E.2d 1058.  However, the *Wal–Mart* decision emphasized:

" 'The doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time, but rather a rule of fundamental and substantial justice, or public policy and of private peace.  The doctrine may be said to adhere in legal systems as a rule of justice.' "

*Wal–Mart,* 93 Ohio St.3d at 491, 756 N.E.2d 657, quoting 46 American Jurisprudence 2d (1994) 786–787, Judgments, Section 522.

{¶ 38} *Fort Frye Teachers Assn. v. SERB* (1998), 81 Ohio St.3d 392, 395, 692 N.E.2d 140, addressed findings of fact made by a federal court jury, which later were adopted and applied in a State Employee Relations Board proceeding.  It defined issue preclusion as follows:

The doctrine of issue preclusion, also known as collateral estoppel, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different.  While the merger and bar aspects of *res judicata* have the effect of precluding the relitigation of the same cause of action, the collateral estoppel aspect precludes the relitigation, in a second action, of an issue that has been actually and necessarily litigated and determined in a prior action that was based on a different cause of action.  *Whitehead v. Gen. Tel. Co.* (1969), 20 Ohio St.2d 108, 112, 49 O.O.2d 435, 437–438, 254 N.E.2d 10, 13.  "In short, under the

rule of collateral estoppel, even where the cause of action is different in a subsequent suit, a judgment in a prior suit may nevertheless affect the outcome of the second suit." Id. at 112, 49 O.O.2d at 438, 254 N.E.2d at 13.

(Citations omitted.)

{¶ 39} The Tenth District Court of Appeals decision in *Nye*, 165 Ohio App.3d 502, 2006-Ohio-948, 847 N.E.2d 46, ¶ 15–19, and the recent Eighth District decision in *Marc Glassman, Inc. v. Fagan*, 8th Dist. No. 87164, 2006-Ohio-5577, 2006 WL 3028419, also recognized that Ohio courts have adopted a relaxed mutuality standard in recent years. Id. at fn. 2. Issue preclusion will apply so long as the party against whom a judgment is applied had a full and fair opportunity to litigate the matter, unless particular circumstances or justice justifies relitigation.

## VIII. *Mutuality in the Context of Criminal Convictions*

{¶ 40} No reason is apparent to apply a rule other than relaxed mutuality when dealing with affirmative claims by a criminal that contradict his conviction following a full jury trial. The finality that ought to attach to a judgment of conviction in a criminal case was recognized in *State v. Szefcyk* (1996), 77 Ohio St.3d 93, 671 N.E.2d 233. The syllabus paragraph prepared by the court ruled: "Under the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating *in any proceeding*, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment." (Emphasis added.) In the body of the *Szefcyk* opinion the court stated "Our holding today underscores the importance of finality of judgments of conviction." Id. at 95, 671 N.E.2d 233. While it might have been useful if the court had cited *Szefcyk* when writing the *Vahila* decision (since by coincidence *Szefcyk* was decided the very next day after *Vahila* was argued), as explained below so long as the general language about no "rule of thumb" is not taken out of context in *Krahn* and *Vahila*, all of these decisions are compatible.

{¶ 41} *White v. Suster*, 101 Ohio St.3d 212, 2004-Ohio-719, 803 N.E.2d 813 (per curiam), should also be noted, for it recognized the preclusive effect in later postconviction (civil) proceedings of an earlier decision denying a criminal defendant's motion to withdraw his guilty plea in his criminal case. Id. at ¶ 8; see, also, *Wloszek v. Weston, Hurd, Fallon, Paisley & Howley, LLP*, 8th Dist. No. 82412, 2004-Ohio-146, 2004 WL 64947, at ¶ 39–40 (following federal decisions in concluding that relitigation in a civil action of an issue determined adversely to

the defendant in a prior criminal proceeding is foreclosed, whether the prior determination was based on a jury verdict or a guilty plea).

{¶ 42} Thus, ordinary principles of collateral estoppel do apply in this legal-malpractice case premised upon the conviction rendered at a full criminal jury trial. Although Blackwell need not obtain a reversal of his conviction in order to sue his lawyers, the judgment against him cannot be ignored when considering his claims explicitly or impliedly asserting actual innocence. His allegations of fact must give way to the facts squarely tried and resolved against him.[5] There is no other sensible way to apply *Krahn*, given Ohio law on collateral estoppel. It merits note, in that regard, that a recent Colorado Supreme Court decision expressly following *Krahn* held that "[i]f the actual factual or legal matter at issue in the civil proceeding is identical to one raised and decided in the criminal proceeding, issue preclusion can apply." *Rantz*, supra, 109 P.3d at 140.

{¶ 43} Any uncertainty on this issue seems best resolved by returning to the Ohio Supreme Court's statement in *Szefcyk*: "Our holding today underscores the importance of finality of judgments of conviction. ' "Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." * * * "It is a rule of fundamental and substantial justice * * *." ' " *Szefcyk*, 77 Ohio St.3d at 95, 671 N.E.2d 233, quoting *Baldwin v. Traveling Men's Assn.* (1931), 283 U.S. 522, 525, 51 S.Ct. 517, 75 L.Ed. 1244, and *Hart Steel Co. v. RR. Supply Co.* (1917), 244 U.S. 294, 299, 37 S.Ct. 506, 61 L.Ed. 1148. Of course, the same public policy favoring finality of judgments is recognized in the federal system. *Waifersong Ltd., Inc. v. Classic Music Vending* (C.A.6, 1992), 976 F.2d 290, 292, cited with approval in *GenCorp, Inc.*, supra, 477 F.3d at 372.

{¶ 44} Defendants' motion for summary judgment is therefore granted in part. All of plaintiff's allegations contesting or denying guilt, or suggesting any notion of actual innocence are barred by his federal conviction.

## IX. *Defendants' Intervening-Cause Argument*

{¶ 45} Defendants also seek summary judgment premised upon the view that Blackwell's "acts of witness intimidation and false testimony are an intervening

---

5. In passing, it surely would be ironic if the law attributed something less than the same finality accorded civil judgments to the criminal judgment against Blackwell, in view of the heightened sensitivity of late to fully protecting the Sixth Amendment right of an accused to a jury determination of facts. E.g., *Cunningham v. California* (2007), 549 U.S. ——, 127 S.Ct. 856, 166 L.Ed.2d 856; *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403; *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435; and *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

cause of his conviction" separate and apart from the law firm's alleged legal malpractice. Reply Memorandum filed Jan. 25, 2007, at 7. Because all of the events implicated in plaintiff's conviction cannot be revisited in this case, this argument is moot.

## X. *What Is Left?*

{¶ 46} Under Ohio law, a legal-malpractice case subsumes within it any of the issues that can arise from the attorney-client relationship. These may include alleged billing errors by the lawyer. *Byrd v. Peden* (1999), 10th Dist. No. 99AP–111, 2000 WL 192571. All claims in tort, fraud, or contract against a lawyer are, essentially, considered to be malpractice. *Gullatte v. Rion* (2d Dist.2000), 145 Ohio App.3d 620, 626, 763 N.E.2d 1215. "Malpractice by any other name still constitutes malpractice." *Muir v. Hadler Real Estate Mgmt. Co.* (10th Dist.1982), 4 Ohio App.3d 89, 90, 4 OBR 170, 446 N.E.2d 820; *Dingus v. Kirwan,* 6th Dist. No. E–05–082, 2006-Ohio-4295, 2006 WL 2384070, at ¶ 10; see, also, *Kester v. Brakel,* 10th Dist. No. 06AP–253, 2007-Ohio-495, 2007 WL 353098, at ¶ 20–24 (holding that separate theories of recovery all constituted a medical-malpractice claim); *Andrianos v. Community Traction Co.* (1951), 155 Ohio St. 47, 51–52, 44 O.O. 72, 97 N.E.2d 549 (holding that whether in contract or tort, all bodily-injury cases are covered by the same statute of limitations), following *Gillette v. Tucker* (1902), 67 Ohio St. 106, 65 N.E. 865 (holding that whether in tort or contract all malpractice claims are covered by the same statute of limitations).

{¶ 47} Some questions raised by Blackwell do not turn upon his claimed actual innocence and remain viable while recognizing the federal judgment. Whether addressed to plea-negotiation strategy, the reasonableness of legal fees, or other matters identified in the *Krahn* line of cases, such questions fall within the general category of malpractice. As such, they generally turn upon whether defendants exercised the reasonable skill, care, and diligence expected of an attorney under like or similar circumstances. See 3 Ohio Jury Instructions (2004) Section 333.01.

{¶ 48} A recent decision in *Winniczek v. Nagelberg* (C.A.7, 2005), 394 F.3d 505, offers persuasive guidance here. It dealt with the scope of a legal-malpractice claim arising from a criminal conviction coupled with a fees dispute. Portions of the case were analyzed under Illinois law as involving legal malpractice, breach of contract, and breach of fiduciary duty. The legal-malpractice claim was readily dismissed. Winniczek had pleaded guilty to federal charges, and his conviction remained in force, which doomed his claim for legal malpractice because "[u]nder Illinois law, as that of other states, a criminal defendant cannot bring a suit for malpractice against his attorney merely upon proof that the attorney failed to

meet minimum standards of professional competence and that had he done so the defendant would have been acquitted on some technicality; the defendant (that is, the malpractice plaintiff) must also prove that he was actually innocent of the crime * * *." *Winniczek* at 507.

{¶ 49} As discussed above the exoneration or actual-innocence rule, as Judge Posner called it, does not reflect Ohio law, because obtaining relief from a conviction is not a prerequisite to bringing a legal-malpractice case in Ohio. The useful part of the *Winniczek* decision, however, lies in its resolution of the companion claim challenging the legal fee charged the convicted criminal. That issue was not viewed as barred from consideration even in a jurisdiction that relies upon the actual-innocence rule.

This analysis shows that the logic of the "actual innocence" rule does not extend to a case in which the complaint is not that the plaintiff lost his case because of his lawyer's negligence, but that he was overcharged. The fact that one of the plaintiffs, namely Mrs. Winniczek, wasn't even charged with a crime merely underscores the district court's error. She is seeking restitution of money obtained from her by false pretenses or breach of an implied contract. But so is Winniczek, in count one of the complaint, which is for breach of contract or, what need not be distinguished in this case (for all that is important is that the Winniczeks are complaining only about an overcharge, and not about Nagelberg's failure to gain Winniczek an acquittal or a lighter sentence), breach of the fiduciary obligation that Nagelberg, as Winniczek's lawyer, owed him. Only count two is for malpractice, and only that count is barred by the requirement, in a malpractice suit growing out of a criminal conviction, of proving actual innocence of the crime.

To see why count one is not about malpractice, imagine that Nagelberg had promised to represent Winniczek for a fee of $ 50,000, plus $ 25,000 in prepaid expenses of which any amount not expended was to be returned to Winniczek. Suppose further that Nagelberg had done a superb though ultimately unsuccessful job in representing Winniczek but had incurred expenses of only $ 5,000 and refused to refund the balance of the $ 25,000 in prepaid expenses. There would be no malpractice, in the sense of incompetent representation—and there would be nothing in the thinking behind the actual-innocence rule to suggest that Winniczek should not be allowed to enforce his contract just because he had been convicted. So we are not surprised that the courts that have confronted this type of case—no Illinois court has—have held that the actual-innocence rule is not a bar. *Bird, Marella, Boxer & Wolpert v. Superior Court,* 106 Cal.App.4th 419, 130 Cal.Rptr.2d 782 (App.2003); *Van Polen v. Wisch,* 23 S.W.3d 510, 516 (Tex.App.2000); *Labovitz v. Feinberg,* supra, [47 Mass.App.Ct. 306] 713 N.E.2d [379] at 385 [ (1999) ]. As explained in *Bird,*

*Marella,* "a fee dispute between a convicted criminal defendant client and his former counsel does not entail the policy considerations which arise from a malpractice suit. The client does not seek to shift the punishment for his criminal acts to his former counsel nor is the client's own criminal act the 'ultimate source of his predicament' as evidenced by the fact a client *acquitted* of the criminal charges against him could have suffered the same unlawful billing practices * * *. Furthermore a fee dispute between client and counsel does not give rise to the practical problems and pragmatic difficulties inherent in a malpractice action brought by a convicted criminal defendant client. * * * [T]here is no difficulty in quantifying damages for a wrongful conviction or a longer prison sentence and there is no problem of applying a standard of proof within a standard of proof. A judgment for the client in a fee dispute is not inconsistent with a judgment for the People in the criminal case. And, there is no duplication of effort since a fee dispute obviously cannot be resolved through postconviction relief." 130 Cal.Rptr.2d at 789 (emphasis in original). (Citations omitted.) *Winniczek,* 394 F.3d at 508–509.

{¶ 50} Similar logic was embraced by the dissenting judge in *Bloomer v. Gibson,* 2006 Vt. 104, 912 A.2d 424, who simply observed that "[t]he policy reasons underlying the actual innocence rule lose their force in the context of a fee dispute." Id. at ¶ 54. This court agrees that that is a proper application of *Krahn.*

{¶ 51} While collateral estoppel precludes revisiting all facts reasonably pertinent to Blackwell's federal conviction, the obligation to pay fees to Porter Wright is separate and distinct. What fee agreement existed, how much Blackwell paid to date, how much work was reasonably required of the law firm, and whether the firm acted improperly under its fee agreement in demanding security before proceeding to trial are all questions independent of the conviction. And, of course, to the extent Blackwell's malpractice claim is predicated upon things like being charged fees for unnecessary work, it reflects the mirror image of defendants' counterclaim for $2.7 million in unpaid fees. Nothing in the resolution of these issues contradicts Blackwell's conviction.

{¶ 52} To be sure, practical difficulty may arise in sorting out what parts of the malpractice claim (and what pretrial discovery or evidence at trial) are fairly foreclosed by the conviction and what remains open. Necessarily the nature and scope of the federal court proceedings must be considered as the backdrop for issues of legal fees, for they bear upon the novelty and complexity of the work undertaken by Porter Wright, and determination of reasonable legal fees. But the fact that Blackwell's defense ultimately proved unsuccessful is irrelevant. Accordingly, arguments over things like whether the Porter Wright firm did a good job cross-examining Lundgren or Kahl, or should have sent subpoenas to

Lundgren's parents, or otherwise ought to have used some strategy that might have exonerated plaintiff simply cannot be tried.

## XI. *The Statute of Limitations for Legal Malpractice*

{¶ 53} Defendants' final argument is that any issue remaining in this lawsuit (after giving effect to the federal conviction) is barred by the one-year statute of limitations for legal malpractice. R.C. 2305.11(A) is the one-year statute of limitations for a legal-malpractice claim. It expires one year after the date on which a client faces a cognizable event, whereby the client discovers or should have discovered that he or she has been injured by the attorney's act or neglect, or one year after the attorney-client relationship for the particular transaction or undertaking terminates, whichever occurs later. *Jackson v. Greger,* supra, 110 Ohio St.3d 488, 2006-Ohio-4968, 854 N.E.2d 487, ¶ 18; *Cicchini v. Streza,* 160 Ohio App.3d 189, 2005-Ohio-1492, 826 N.E.2d 379, ¶ 18, both citing *Zimmie v. Calfee, Halter & Griswold* (1989), 43 Ohio St.3d 54, 538 N.E.2d 398, syllabus.

{¶ 54} Defendants argue that Blackwell faced a cognizable event once he lost the jury verdict, gaining thereby such a clear awareness of legal errors that the one-year clock started to run. They point out that new counsel were retained a short time later to handle Blackwell's criminal sentencing and appeal and that plaintiff's counsel in this malpractice case were hired and in communication with the Porter Wright firm over legal fees more than a year before this suit was brought. A notice of appearance in the district court by Thompson Hine, the new firm that took over as lead counsel, plus correspondence by letter and e-mail is of record memorializing these developments. Singer affidavit at tabs J, K, and L.

{¶ 55} *Flynt v. Brownfield, Bowen & Bally* (C.A.6, 1989), 882 F.2d 1048, 1052–1053, is argued to be a compelling precedent. Relying upon Ohio law, that decision did recognize that in some circumstances the statute of limitations for malpractice may begin to run on a particular legal undertaking or transaction even before the overall relationship between the attorney and client is terminated. However, *Flynt* is inapposite on the facts presented here.

{¶ 56} All of the evidence in this record demonstrates that Porter Wright did not end its representation of Blackwell before December 15, 2005, which falls well within the year before suit was filed. While the law firm was replaced as primary trial counsel for Blackwell on September 6, 2005, following the jury verdict, that did not end its active involvement. The notice of substitution of counsel filed in United States District Court explicitly stated that Porter Wright "will remain Of Counsel for Professor Blackwell." Singer affidavit at tab L. Furthermore, an e-mail message written by defendant Gorman on August 31, 2005, stated, "TH [the Thompson Hine firm] is going to be designated trial

counsel (lead) for the CR [sic] case with use [sic] as counsel on the understanding that we have no responsibility unless specifically asked to do something." Id. at tab K. Legal-fee billings (filed by plaintiff on Feb. 15, 2007) directly prove that significant professional work was performed by Porter Wright in the months following Thompson Hine's appearance while Porter Wright remained of counsel. In October 2005, defendant Gorman and another partner (billing at $400 per hour) allegedly worked 38.8 hours, and charged the plaintiff a fee of nearly $18,000. In December 2005, three partners invested 12.8 hours, including work on the sentencing memorandum for Blackwell and his motion for a new trial. Their work resulted in charges of $5,200 more. Finally, a letter sent to Blackwell on December 15, 2005, stated, "With the conclusion of the proceedings in the trial court in the criminal case * * * our representation of you in that case has concluded." Exhibit B to plaintiff's memorandum filed January 12, 2007. Furthermore, in a companion civil case before the district court brought by the SEC (pending before District Judge Marbley), Porter Wright told Blackwell in its December 15, 2005 letter that "at the moment, the civil case continues to be stayed" but since Thompson Hine had "substituted in as trial counsel, it is appropriate that our representation of you in that matter also come to a conclusion. Accordingly, we intend to file the appropriate papers to withdraw in that action."

{¶ 57} This case was filed September 27, 2006. Pursuant to Civ. R. 56(D), this court finds nothing in the record suggesting that there is any genuine issue over the fact that sometime prior to September 27, 2005, "the 'mutual confidence' so essential to the attorney-client relationship must be regarded as lacking," such as could justify a reasonable jury in starting the statute-of-limitations clock under cases like *Flynt*, supra, 882 F.2d 1048. Similarly, nowhere is there any evidence of some sort of "carefully limited professional arrangement that the [law firm] defendants entered into in response to threatened legal action by the plaintiffs" such as those that were discussed in *Flynt* at 1052. After Blackwell's conviction, and well into the one-year period at issue, Porter Wright retained a diminished but active role. It charged substantial legal fees in performing that role. Beyond that, nothing before this court suggests that Blackwell was somehow trying to trick the Porter Wright firm, or unduly perpetuate its exposure to suit with phony arrangements made only to keep the statute of limitations open once Thompson Hine assumed the lead role. See id. at 1052–1053.

{¶ 58} The decision in *Cicchini*, supra, like other decisions defining "cognizable event" as one trigger for the statute of limitations, plainly suggests that losing the criminal verdict coupled with Blackwell's recognition that new counsel should be retained for posttrial motions, sentencing, and appeal and to address the legal fees owed the Porter Wright firm does satisfy one prong of the *Zimmie* test.

■■■■■■■■■■
■■■■■■■■■■

See *Cicchini*, 160 Ohio App.3d 189, 2005-Ohio-1492, 826 N.E.2d 379, at ¶ 30; *Triplett v. Benton*, 10th Dist. No. 03AP–342, 2003-Ohio-5583, 2003 WL 22390065, ¶ 11. But that one prong is not enough to find a time bar to this suit. The statute starts on the later of either a cognizable event or final termination of the attorney-client relationship for a particular transaction or matter in litigation. Because final termination of defendants' work on Blackwell's federal criminal case occurred well within one year before this suit was filed, under the second prong of the *Zimmie* test this malpractice suit was timely. Accordingly, defendants' motion for summary judgment based upon the one-year statute of limitations is denied.

So ordered.